**CORRECTED**

# In the United States Court of Federal Claims

No. 18-1099C

Filed: November 20, 2019

|  |  |
|---|---|
| **RIVERVIEW FARMS, et al.,** | ) ) ) |
| *Plaintiffs,* | ) ) |
| v. | ) ) |
| **THE UNITED STATES,** | ) ) |
| *Defendant.* | ) ) ) ) |

*Ethan A. Flint*, Flint Law Firm, LLC, Edwardsville, IL, for plaintiffs, with whom was *Adam M. Riley*, Flint Law Firm, LLC, Edwardsville, IL, of counsel.

*Edward C. Thomas, IV*, National Resources Section, Environment and National Resources Division, U.S. Department of Justice, Washington, D.C., for defendant, with whom were *Brigman L. Harman* and *Dustin J. Weisman*, National Resources Section, Environment and National Resources Division, U.S. Department of Justice, Washington, D.C., of counsel.

**OPINION AND ORDER**

***HERTLING*, Judge**

The plaintiffs in this fifth amendment takings case own land in Kentucky, Illinois, and Missouri, that is allegedly subject to flooding from the Mississippi and Ohio Rivers. They allege that the United States took their land without just compensation because it has constructed river-training structures and dams, which have started to cause atypical flooding. The United States moved to dismiss the action under Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"). The government argues that the plaintiffs' claims, if true, are time-barred, and alternatively, that the Amended Complaint fails to state a claim for a taking. For the reasons explained below, the Court defers the government's motion to dismiss for lack of subject matter jurisdiction and denies the government's motion to dismiss for failure to state a claim.

**I.  BACKGROUND**

    **A.  Legal Background**

The government's motion to dismiss for lack of subject-matter jurisdiction turns on when a taking occurs. That is a highly factual inquiry, but one that requires an understanding of the Tucker Act's claim-accrual and statute-of-limitations principles.

The government's motion to dismiss for lack of subject-matter jurisdiction turns on when a taking occurs. That is a highly factual inquiry, but one that requires an understanding of the Tucker Act's claim-accrual and statute-of-limitations principles.

As a threshold matter, the Takings Clause of the fifth amendment of the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The Federal Circuit has established a two-part test for whether a plaintiff is owed compensation for a taking: "[f]irst, as a threshold matter, . . . whether the claimant has established a property interest for the purposes of the fifth amendment[;]" and "[s]econd, after having identified a valid property interest, . . . whether the government action amounted to a compensable taking of that property interest." *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1377-78 (Fed. Cir. 2008).

The Tucker Act waives sovereign immunity for certain claims against the United States, including fifth amendment takings claims. *See* 28 U.S.C. § 1491; *see also United States v. Sherwood*, 312 U.S. 584, 586 (1941). The waiver of immunity "may not be inferred, but must be 'unequivocally expressed.'" *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (quoting *United States v. Mitchell*, 445 U.S. 535, 538 (1980)). When any statutory waiver of sovereign immunity includes a statute of limitations, "'the limitations provision constitutes a condition on the waiver of sovereign immunity.'" *Yankton Cty., South Dakota v. United States*, 135 Fed. Cl. 620, 628 (2017), *aff'd*, 753 F. App'x 905 (Fed. Cir. 2019), *cert. denied sub nom. Yankton Cty., S.D. v. United States*, No. 18-1417, 2019 WL 4921357 (U.S. Oct. 7, 2019) (quoting *Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983)).

Under the Tucker Act, monetary claims against the United States must be brought within six years from the date the claim accrued. *See* 28 U.S.C. § 2501. In general, a claim accrues "when all the events have occurred that fix the alleged liability of the government and entitle the claimant to institute an action." *Ingrum v. United States*, 560 F.3d 1311, 1314 (Fed. Cir. 2009). Under the stabilization doctrine, however, the Supreme Court has recognized that "the statute of limitations d[oes] not bar an action under the Tucker Act for a taking by flooding when it [is] uncertain at what stage in the flooding operation the land had become appropriated for public use." *United States v. Dow*, 357 U.S. 17, 27 (1958); *see also United States v. Dickinson*, 331 U.S. 745, 747 (1947) (developing the stabilization doctrine). In such instances, the statute of limitations is tolled until the claim stabilizes, which is when "it becomes clear that the gradual process set into motion by the government has effected a permanent taking[.]" *Boling v. United States*, 220 F.3d 1365, 1370-71 (Fed. Cir. 2000).

The stabilization doctrine is not an exception to the general rules of claim accrual; it is another type of claim accrual. *Id.* at 1371. The doctrine recognizes both that takings by flooding or gradual processes cannot be as readily ascertained as a taking by one event, but also that the Tucker Act's statute of limitations requires some line-drawing.

In a takings case involving flooding after riparian changes and new groundwater retention practices in California's Central Valley, the Court of Claims, the Federal Circuit's predecessor court, acknowledged that a broad interpretation of the stabilization doctrine would be in "unending conflict with the statute of limitations." *Gustine Land & Cattle Co. v. United States*,

174 Ct. Cl. 556, 656-57 (1966).  The application of the doctrine means that stabilization often occurs before "the damages are complete and fully calculable."  *See Mildenberger v. United States*, 643 F.3d 938, 946 (Fed. Cir. 2011) (takings claim time barred when plaintiffs postponed suit until damages complete).  In this case before the Court, a taking occurred, and the statute of limitations began to run when it became clear that the gradual pattern of intermittent flooding had effected a permanent taking.

  **B.**  **Factual Background**

    **1.**  **The Plaintiffs**

  The plaintiffs in this action are landowners, including farmers and owners of recreational land, in Kentucky, Illinois and Missouri.  They allege that their land has been taken due to flooding of the Mississippi and Ohio Rivers.  Although neither the Complaint nor the Amended Complaint provide exact addresses for the majority of the plaintiffs, the information in the Amended Complaint discloses that the plaintiffs' properties are relatively equally split between the Lower Ohio River and the Lower Mississippi River, south of the confluence of the Mississippi and Ohio Rivers at Cairo, Illinois.[1]  The map below shows the area where the plaintiffs' properties appear to be:



**Figure 1: Kentucky and Barkley Reservoir Locations with Principal Features near the Ohio River and Mississippi River Junction**

---

[1] Several plaintiffs' properties were only identified by a street, town or county.  Other plaintiffs' properties were more readily identifiable because their properties were denoted by intersections, road boundaries, or exact addresses.  One plaintiff's property appears to be located near the Tennessee River.  The plaintiffs did not make any allegations, either in their complaint or response to the government's motion to dismiss, about the Tennessee River.

(*See* Defendant's Motion to Dismiss ("Def. Mot."), Ex. 3 at Ex. A, ECF 36-3 (map of Ohio River, Mississippi River, and Tennessee River, showing the Birds Point-New Madrid Floodway on the Mississippi River and the Barkley Dam and Kentucky Dam on the Tennessee and Cumberland Rivers, tributaries of the Ohio River).)

For the purpose of this opinion, the Court considers the plaintiffs in two groups: the Mississippi River plaintiffs and the Ohio River plaintiffs.

### 2. Navigation Improvements, River-Training Structures and Flooding

Although both the Mississippi and Ohio Rivers have a long history of flooding, the actions taken by the U.S. Army Corps of Engineers ("Corps") have differed on each river. Since the nineteenth century, the Corps has been changing the flow of the Mississippi and Ohio Rivers to mitigate the impacts of flooding and improve navigability through "river training" or "river manipulation." (Amended Complaint ("Am. Compl.") ¶ 2, ECF 10; *see also* Defendant's Motion to Dismiss ("Def. Mot."), Ex. 3, Ex. A at 29, ECF 36-3.)

Insofar as relevant, the Corps manages sections of the Mississippi and Ohio Rivers as follows: (1) the Middle Mississippi River ("MMR"), from the confluence with the Missouri River to the confluence with the Ohio River at Cairo, Illinois; (2) the Lower Mississippi River ("LMR"), from the confluence of the Ohio River to the Gulf of Mexico; and (3) the Lower Ohio River ("LOR"), from the Smithland Lock and Dam to the confluence with the Mississippi River at Cairo, Illinois. (Def. Mot. at 3, ECF 36.)

#### a. Mississippi River

Since 1824, Congress has mandated navigation and flood-mitigation improvements to the Mississippi River.[2] Beginning in 1910, Congress authorized the use of river-training structures, which reduce expenditures and minimize maintenance dredging by "re-directing the river's energy to achieve a desired velocity and/or scour pattern to deepen or provide better alignment for the navigation channel." (Def. Mot., Ex. 1 at 5, ECF No. 36-1.) The purpose of such structures is to "constrict the river channel, concentrate flow, redirect sediment, and deepen and maintain the navigable portion of the channel." (Am. Compl. ¶ 169, ECF 10.) The types of river-training structures at issue in this case are pictured below, clockwise, starting at the upper right: wing dikes, bendway weirs, W-dikes, S-dikes (a.k.a. Z-dikes), and chevron dikes.

---

[2] *See, e.g.*, Rivers & Harbors Act of 1824, 18 Cong. Ch. 140, 4 Stat. 32, 33; Act of June 10, 1872, 42 Cong. Ch. 415, 17 Stat. 347; Act of Mar. 3, 1873, 42 Cong. Ch. 233, 17 Stat. 560; Act of June 25, 1910, Pub. L. No. 61-264 36 Stat. 630, 654, 658-59; Act of Mar. 4, 1913, Pub. L. No. 62-241, 37 Stat. 801; Act of Mar. 2, 1913, Pub. L. No. 62-429, 37 Stat. 725; Act of July 27, 1916, Pub L. No. 64-168, 39 Stat. 391; Rivers & Harbors Act of Jan. 21, 1927, Pub. L. No. 69-560, 44 Stat. 1010, 1012-13 (the "1927 Act").



(Def. Mot., Ex. 8 at Exs. E, J, G, H, F, ECF 36-8.)

During the twentieth century and continuing into the present, the Mississippi River has experienced several especially severe floods, including in 1926 and 1927, 1973, 1993, 2011 and 2016.  In 1926 and early 1927, the River flooded, inundating approximately 26,000 square miles in the Lower Mississippi Valley.  This historic flooding displaced 600,000 people and killed 250. (Def. Mot., Ex. 3 at IV-4, ECF 36-3.)  In response to that flood, in January 1927, Congress authorized river manipulation on the Mississippi River through the Rivers and Harbors Act of 1927 ("1927 Act").[3]  According to the plaintiffs, the 1927 Act "authorized the establishment of a navigable channel 300 feet wide and at least nine feet deep on the Middle Mississippi River[.]" (Am. Compl. ¶¶ 165-66, ECF 10 (citing the 1927 Act).)

Congress further responded to the 1927 flood with the 1928 Flood Control Act.  Pub. L. No. 70-391, 45 Stat. 534; *codified at* 33 U.S.C. § 702a.  The 1928 Flood Control Act authorized a system of levees, floodways, spillways, and bank-stabilization measures to mitigate flooding throughout the Mississippi River Valley, including the Birds Point-New Madrid Floodway, located south of the confluence of the Ohio and Mississippi Rivers between Birds Point, Missouri and New Madrid, Missouri.

In 1973, the Mississippi River flooded in the areas where the plaintiffs own land.  (Am. Compl. ¶ 197, ECF 10; Def. Mot. at 8, ECF 36.)  The 1973 flood "is documented as having [had] significant impacts on the morphology of the MMR."  (Def. Mot., Ex. 1 at A-4, ECF 36-1.)

---

[3] Rivers & Harbors Act of Jan. 21, 1927, Pub. L. No. 69-560, 44 Stat. 1010.

After the 1973 flood, "there were no increasing [river] stage[4] trends for within-bank flows at any of the [river] gages."[5] (*Id.*)

Starting in the 1980s and 1990s, the Corps began to shift away from dredging as a means of navigational maintenance. (Am. Compl. ¶¶ 174-76, ECF 10.) Instead, the Corps developed new river-training structures, including bendway weirs, which are "[t]otally submerged stone weirs along the outside of a river bend[.]" (*Id.* ¶ 179.) The Corps built 40,000 linear feet of dikes and bendway weirs on the MMR between 1990-93, and as of 2012, "at least 182 bendway weirs" had been constructed in the same stretch, "with a cumulative length of at least 119,865 linear feet." (*Id.* ¶¶ 180-82.) The Corps also built chevron dikes, additional wing dikes, and W- and S-dikes. (*See* Def. Mot. at 7, ECF 36; Am. Comp. ¶¶ 183-86, ECF 10.) The Corps built "23 chevron [dikes] in the Middle Mississippi River" between 2003 and 2010. (Am. Compl. ¶ 188, ECF 10.)

There are currently nearly 1600 river-training structures in the MMR. (Def. Mot., Ex. 5 at Ex. C at 10, ECF 36-5.) The majority of these river-training structures were built in the early to mid-twentieth century. (Def. Mot. at 7, ECF 10.) Further, 91 percent of these structures were in place by 2000. (Def. Mot., Ex. 8 at Ex. C, ECF 36-8 at 8; Def. Mot., Ex. 9 at Ex. L at 28, ECF 36-9.) Similarly, more than 82 percent of bendway weirs were already in place by 2000. (Def. Mot., Ex. 8 at Ex. D, ECF 36-8.)

The LMR has a similar story: 96 percent of river-training structures in that section of the River had been built by 2000. (Def. Mot., Ex. 9 at Ex. K, ECF 36-9.)

A 2000 U.S. Fish and Wildlife Service publication, "Biological Opinion for the Operation and Maintenance of the 9-Foot Navigation Chanel on the Upper Mississippi River System," noted that changes to the MMR's natural hydrography had resulted in drier river banks and reduced water-surface elevations at low-discharge levels. (Plaintiffs' Response ("Pls.' Resp."), Ex. 2 at 63, ECF 37-2.) The opinion also noted that "the number of days water elevations are above flood stage" had increased.[6] (*Id.*)

From 2003 to 2011, several news articles covered the Corps' changes to the Mississippi River, including river-training structures, and their potential impact on flooding. On July 30, 2003, the *St. Louis Post-Dispatch* published an article discussing multiple studies "show[ing]

---

[4] The Corps defines "river stage" as "[a] measurement of the depth of water above an arbitrary reference point in a stream channel." *See Glossary*, *"Stage"*, RIVERGAGES.COM (last accessed Nov. 12, 2019) http://rivergages.mvr.usace.army.mil/WaterControl/glossary2.cfm.

[5] The U.S. Geological Survey uses "gage" instead of "gauge" to describe river conditions. *See Why does the USGS use the spelling "gage" instead of "gauge"?*, U.S. GEOLOGICAL SURVEY (last accessed Nov. 5, 2019) https://www.usgs.gov/faqs/why-does-usgs-use-spelling-gage-instead-gauge?qt-news_science_products=0#qt-news_science_products.

[6] Flood stage refers to "[t]he gage height of the lowest bank of the reach in which the gage is situated. The term 'lowest bank' is, however, not to be taken to mean an unusually low place or break in the natural bank through which the water inundates an unimportant and small area." *Flood stage, Glossary*, U.S. GEOLOGICAL SURVEY (last accessed Nov. 7, 2019) https://water.usgs.gov/wsc/glossary.html#Floodstage.

that similar volumes of water are resulting in higher flood levels over time," while noting that the Corps has rejected these studies as fundamentally flawed. (Def. Mot., Ex. 16, ECF 36-16.) Two 2008 articles, one in *Time* and one in *Salon*, linked increases in the severity and frequency of flooding, and specifically the 1993 and 2008 floods, to the Corps' river-training structures. (Def. Mot., Exs. 17, 18, ECF 36-17, 36-18.) News coverage continued in 2010 with an editorial published in the *St. Louis Post-Dispatch*, noting the decades of scientific research linking river structures to worsened flooding and proposing that an independent review of chevron dikes should occur before the Corps constructs any additional river-training structures in the MMR. (Def. Mot., Ex. 20 at 2, 4, ECF 36-20.) In 2011, the *Atlantic* published an article detailing the history of flooding on the Mississippi River. (Def. Mot., Ex. 15, ECF 36-15.) The article connected the 1973 flood to human intervention in the form of river-training structures and levees. (*Id.*)

Also in 2011, the *Southern Illinoisan* published several articles linking river-training structures to increased Mississippi River flooding. One article linked the magnitude of the 1993 flood to the Corps' construction of river-training structures on the Mississippi. (Def. Mot., Ex. 19, ECF 36-19.) Another reported that local high school students were researching whether the Corps' river-training structures have any impact on flooding in the MMR. (Def. Mot., Exs. 25, 26, ECF 36-25, 36-26.)

In addition to the news coverage, the U.S. Geological Survey issued Circular 1375, titled "A Brief History and Summary of the Effects of River Engineering and Dams on the Mississippi River System and Delta" in June 2012. (Pls.' Resp., Ex. 1, ECF 37-1.) The Circular reviewed previous studies and concluded that the "extensive system of levees and wing dikes" in the Mississippi River protect against "intermediate magnitude floods" but have "reduced overall channel capacity and increased flood stage by up to 4 meters for higher magnitude floods." (*Id.* at 1.) The Circular referenced a study from 1989, that found that sedimentation-induced loss of storage had increased flood stages at older dams to near pre-dam levels, increasing the number of flood days. (*Id.*) The Circular also referenced three different studies from 1975, 2001, and 2006, that found that "wing dikes, in combination with levees, have reduced overall channel capacity for intermediate and higher discharges, increasing [flood] stages over time." (*Id.* at 1, 18, 36.)

### b. Ohio River

In addition to responding to flooding along the Mississippi River, beginning in about 1906, Congress and the Corps endeavored to improve the Ohio River's navigability. In 1910, Congress passed the Rivers and Harbors Act, authorizing the Corps to build a nine-foot navigation channel on the Ohio River from Pittsburgh, Pennsylvania, where the river begins at the confluence of the Allegheny and the Monongahela Rivers, to Cairo, Illinois, where the Ohio meets the Mississippi.[7]

Neither party has offered evidence of river-training structures on the Ohio River. The only river manipulation in this case appears to be the flood-control mechanisms on direct and indirect Mississippi River tributaries. Specifically relevant here, the Corps built the Kentucky Dam and Reservoir on the Tennessee River in 1945 and the Barkley Dam and Reservoir on the

---

[7] Rivers and Harbors Act of 1910, 61 Cong. Ch. 359, June 23, 1910, 36 Stat. 593.

Cumberland River in 1966 to respond to the flooding threats in the Mississippi and Ohio Rivers and their basins.[8] (*See* Def. Mot., Ex. 3 at Ex. A at VIII-1, II-4, II-1, ECF 36-3.) Together, the Kentucky and Barkley Dams and Reservoirs have a flood capacity of nearly six million acre-feet. (*Id.* at II-5, VIII-1.) The regulation of flows from the Reservoirs has resulted in "significant lower Ohio flood reduction" and in lower stage readings on the Mississippi River at the Cairo, Illinois river stage, and on the Ohio River at the Paducah, Kentucky river stage. (Def. Mot., Ex. 3 ¶¶ 3-6, ECF 36-3; *id.* at Ex. A at Appendix G, X-37-38.)

In 1988 Congress authorized the Olmsted Locks and Dam Project to improve navigation along the Ohio River. Water Resources Development Act of 1988, Pub. L. No. 100-676, 102 Stat. 4012. The locks were constructed offsite from 1992 to 2004. (Def. Mot., Ex. 4, ECF 36-4.) During low-water seasons, the Corps set the dam sections in place, so as not to constrict and redirect the Ohio River using cofferdams. (Def. Mot., Ex. 5, ECF 36-5.) The dam became fully operational in 2018. (Def. Mot., Ex. 4, ECF 36-4.) The Corps lowers the dam's wicket gates during periods of high water flow to facilitate navigation in the Ohio River. (Def. Mot., Ex. 5, ECF 36-5.)

### 3. The Plaintiffs' Claims of Recent Flooding

The plaintiffs allege that their land has been taken by flooding, and that the flooding is not reflected in the government's gage data showing that flooding is no worse than in prior years. The plaintiffs also allege that the government's gage data was "generic," and only parcel-specific data would suffice to counter their allegations. To bolster this argument, the plaintiffs submitted three declarations, which they assert are "representative" of their case. (*See, e.g.*, Oral Argument Transcript ("Tr.") at 60:20, 73:19.) All three declarants allege that their land has experienced atypical, out-of-season flooding since either 2013 or 2015, although they did not provide evidence to show that the government's gage data was incorrect for their properties. (LaFont Decl. ¶¶ 3-4; Boatwright Decl. ¶¶ 3-4; Davis Decl. ¶¶ 3-4 (Pls.' Resp., Exs. 3-5, ECF 37-3, 37-4, 37-5).) At oral argument, the plaintiffs explained that atypical flooding is flooding that occurs outside of historic winter and spring floods, especially during or close to the planting season. (Tr. 57:1-20.) In the plaintiffs' view, it is this atypical flooding that amounts to the taking.

The Court closely reviewed the Amended Complaint in an attempt to find facts in the record to substantiate the plaintiffs' claims. The Court reviewed the address information that the plaintiffs supplied, in order to determine the precise location of the plaintiffs' properties. The Court was unable to do so for nearly 70% of the plaintiffs. At least 10 plaintiffs did not provide specific address information at all—only a county or a town listed as "property location" and no mailing address. Without specific property location information, the Court could not take judicial notice of "parcel-specific" flooding data, even to the extent that such data exists.

Instead, the Court took judicial notice under Rule 201 of the Federal Rules of Evidence of the Corps' daily, monthly, and yearly data on flooding at several gages along the Mississippi and Ohio Rivers.[9] The Court also took judicial notice of the National Weather Service's seasonal

---

[8] Both the Tennessee River and the Cumberland River empty into the Ohio River.
[9] *See, e.g.*, *River Gages*, U.S. ARMY CORPS OF ENG'RS (last accessed Nov. 4, 2010) http://rivergages.mvr.usace.army.mil/WaterControl/yearly_tables2.cfm?sid=03611000&from1=0

rainfall data record at Paducah, Kentucky and Cape Girardeau, Missouri, the only points with such records near the plaintiffs' properties.[10]

With regard to the Ohio River, the gage data at Paducah, Kentucky shows flooding that corresponded with record rainfall in spring 2008, spring 2011, winter 2018-19, spring 2019, and summer 2019.[11] This flood data comports with the broader history of flooding at Paducah, which has experienced flooding in 37 of the 51 years between 1967 and 2018. (Def. Mot., Ex. 13 at Ex. B, ECF 36-13.)

Similarly, on the Mississippi River, the gage data at Cape Girardeau, Missouri shows flooding that corresponded with record rainfall in winter 2007-2008, spring 2008, fall 2009, spring 2011, summer 2015, winter 2018-2019, spring 2019, and summer 2019. Here again, the flood data comports with the broader history of flooding at Cape Girardeau, which has experienced flooding in 39 of the 51 years between 1967 and 2018—including several years (1984, 1993, 2008, 2010 and 2011) when the river was flooded for more than 100 days. (Def. Mot., Ex. 14 at Exs. A, H, ECF 36-14.)

### 4. Plaintiffs' Theory of Causation

The plaintiffs allege that the Corps' river-training structures have caused increased flooding and raised surface-water elevations. The plaintiffs allege further that the numerous river-training structures have "altered natural hydrograph of the Middle Mississippi River by contributing to higher [water-surface elevations] at lower discharges than in the past and to a downward trend in annual minimum stages." (Am. Compl. ¶ 203.)

The plaintiffs do not attempt to pinpoint when the river structures in the Mississippi or Ohio Rivers became sufficiently numerous or of a type to cause atypical flooding. Instead, they allege that the impact of river-training structures on water levels has been cumulative. (Id. ¶ 204.) They contend that the newer structures used by the Corps since the 1980s (in particular the bendway weir) "contribute even more substantially to rising water surface elevations and flooding than their predecessors." (Pls.' Resp. at 3, ECF 37.) The plaintiffs also contend that the

---

1/01/2007&to1=12/31/2019&dt=S&param=HG (river gage data, beginning in 2008 for Paducah, KY on the Ohio River); *River Gages*, U.S. ARMY CORPS OF ENG'RS (last accessed Nov. 4, 2010) http://rivergages.mvr.usace.army.mil/WaterControl/yearly_tables2.cfm?sid=CE401278&from1=01/01/2007&to1=12/31/2019&dt=S&param=HG (river gage data, beginning in 2007 for Cape Girardeau, MO on the Mississippi River).

[10] *Climate Records – Paducah, KY – Seasonal Top 10 Lists*, NAT'L WEATHER SERV. (last accessed Nov. 5, 2019) https://www.weather.gov/pah/PaducahSeasonalRecords; *Climate Records – Cape Girardeau, MO – Seasonal Top 10 Lists*, NAT'L WEATHER SERV. (last accessed Nov. 5, 2019) https://www.weather.gov/pah/CapeGirardeauSeasonalRecords.

[11] The National Weather Service records define spring as March through May, summer as June through August, fall as September through November, and winter as December through February. *See Climate Records – Paducah, KY – Seasonal Top 10 Lists*, NAT'L WEATHER SERV. (last accessed Nov. 5, 2019) https://www.weather.gov/pah/PaducahSeasonalRecords; *Climate Records – Cape Girardeau, MO – Seasonal Top 10 Lists*, NAT'L WEATHER SERV. (last accessed Nov. 5, 2019) https://www.weather.gov/pah/CapeGirardeauSeasonalRecords.

mean local stage [12] of the river has been progressively increasing as a result of the Corps' addition of new structures over time.  (*Id.* at 4.)

There has been public and academic discussion of the theory that river-training structures are responsible for the severity of the flooding on the Mississippi River since at least the mid-1970s, following the 1973 flood.  (*See* Def. Mot. at 8 (citing Michael A. Stevens et al., *Man-Induced Changes of Middle Mississippi River*, 101 J. OF THE WATERWAYS, HARBORS & COSTAL ENG'G DIV. 119-33 (1975); C.B. Belt Jr., *The 1973 Flood and Man's Constriction of the Mississippi River*, 189 SCI. 681-84 (1975)).)  The Corps, together with University of Missouri researchers, "reviewed and rebutted" the theory about river-training structures.  (*Id.* (citing Glendon T. Stevens, *Discussion of "Man-induced Changes of Middle Mississippi River,"* 102 J. OF THE WATERWAYS, HARBORS & COSTAL ENG'G DIV. Issue 2, 280 (1976); Gary R. Dyhouse, *Discussion of "Man-induced changes of Middle Mississippi River,"* 102 J. OF THE WATERWAYS, HARBORS & COASTAL ENG'G DIV. Issue 2, 277-79 (1976); Claude N. Strauser & Norbert C. Long, *Discussion of "Man-induced changes of Middle Mississippi River,"* 102 J. OF THE WATERWAYS, HARBORS & COSTAL ENG'G DIV. Issue 2, 281-82 (1976); Jerome A. Westphal & Paul R. Munger, *Discussion of "Man-induced changes of Middle Mississippi River,"* 102 J. OF THE WATERWAYS, HARBORS & COSTAL ENG'G DIV. Issue 2, 283-84)).)

The media in the plaintiffs' local area have also covered the theory that river-training structures have caused an increase in severe flooding.  Dr. Nicholas Pinter, a professor at Southern Illinois University ("SIU"), was quoted in a June 2008 *Time* article, opining that recent floods in the MMR were caused by river-training structures whose use had significantly increased water levels.  (Def. Mot., Ex. 17, at 2-4, ECF 36-17.)  The editorial board of "St. Louis Today" in an August 2010 column recommended that before the Corps built any more structures, an independent review should be conducted by the National Academy of Sciences in light of "[t]wo decades of peer-reviewed scientific research" showing that river-training structures "worsen flooding." (*Id.* Ex. 20 at 3 ECF 36-20.)  An August 2011 article in the *St. Louis Post-Dispatch* describes the effort of three professors from SIU and Washington University in St. Louis, starting in 2008, to expose "what they consider to be a major threat to the St. Louis-Metro East Mississippi River corridor, which also includes communities farther down the river to Cairo[, Illinois]." (*Id.*, Ex. 19, ECF 36-19.)  That threat was "the construction of river structures," that, they wrote, "exacerbate[d] flooding" and "contributed to the unprecedented levels of the 1993 flood."  (*Id.*)  That article quoted Dr. Pinter, who claimed that "[t]he problem in particular for Southern Illinois is our stretch of the river is the most densely wing-diked of any river in the world, that I've been able to find[.]"  (*Id.* at 7.)  He noted that "flood levels have increased enormously . . . .  At its worst spot, 17 feet higher for the same storm upstream than a flood would have been in the mid-19th century." (*Id.* at 7.)

In 2014, environmental groups brought a lawsuit challenging several Corps environmental assessments that had concluded that river-training structures did not significantly affect water-surface elevations in the MMR.  *See generally Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, No. 14-590-DRH-DGW, 2014 WL 6685235 (S.D. Ill. Nov. 25, 2014).

---

[12] Mean local stage refers to the average "measurement of the depth of water above an arbitrary reference point in a stream channel" for a specific location.  *See* Glossary, "Stage" http://rivergages.mvr.usace.army.mil/WaterControl/glossary2.cfm (last accessed Oct. 23, 2019).

Following the court's denial of the plaintiffs' motion for a preliminary injunction to stop the Corps from placing new river-training structures in the Middle Mississippi River, the plaintiffs voluntarily dismissed their suit. *Nat'l Wildlife Fed'n*, 2014 WL 6685235, at *12.

### C. Procedural Background

On July 26, 2018, the plaintiffs filed this inverse condemnation action against the United States. (Compl. ¶ 1, ECF 1.) The United States moved to dismiss the complaint, arguing that the plaintiffs' claims were time-barred under RCFC 12 (b)(1) because the plaintiffs had alleged a taking for the previous ten years, and failed to state a claim under RCFC 12(b)(6). (Def. Mot., ECF 9.). The plaintiffs then amended their complaint on December 17, 2018, to remove references to flooding over the previous ten years. (Am. Compl., ECF 10.) The government renewed its motion to dismiss (ECF 17). After the plaintiffs identified clerical errors in mean-stage data in declarations supporting the government's renewed motion, the Court permitted the government to refile its renewed motion to dismiss (ECF 28). The case was transferred to this judge in June 2019 (ECF 34). The government corrected the errors in its motion to dismiss in a renewed motion (ECF 36), to which the plaintiffs responded (ECF 37). The motion to dismiss is fully briefed, and the Court heard oral argument on October 22, 2019, in Paducah, Kentucky.

## II. JURISDICTION AND STANDARD OF REVIEW

The Tucker Act, 28 U.S.C. § 1491, provides this Court with jurisdiction to hear suits for compensation under the fifth amendment's Takings Clause. *Boling v. United States*, 220 F.3d 1365, 1370 (Fed. Cir. 2000). Such suits must be brought within six years of the claim's accrual for this Court to have jurisdiction. 28 U.S.C. § 2501; *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1354 (Fed. Cir. 2006).

The government has moved to dismiss the Amended Complaint for lack of subject-matter jurisdiction under RCFC 12(b)(1). In such cases, to determine whether subject-matter jurisdiction exists, the Court accepts "as true all undisputed facts asserted in the plaintiff's complaint and draw[s] all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). When a plaintiff's jurisdictional facts are challenged, however, only those factual allegations that the government does not controvert are accepted as true. *Shoshone Indian Tribe of Wind River Reservation, Wyo. v. United States*, 672 F.3d 1021, 1030 (Fed. Cir. 2012). In evaluating such a challenge, the court is not "restricted to the face of the pleadings" in resolving disputed jurisdictional facts. The court may review evidence outside the pleadings. *Id.* If the court finds that it lacks subject-matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim.

Takings claims accrue "'only when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence.'" *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1359 (Fed. Cir. 2013) (emphasis original) (quoting *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988)). "The act that causes the accrual of a physical taking claim is the act that constitutes the taking." *Id.* (citing *Ingrum v. United States*, 560 F.3d 1311, 1314 (Fed. Cir. 2009)). Thus, when a permanent taking is alleged, "the key date for accrual purposes is the date on which the

plaintiff's land has been clearly and permanently taken." *Boling*, 220 F.3d at 1370 (citing *Seldovia Native Assoc., Inc. v. United States*, 144 F.3d 769, 774 (Fed. Cir. 1998)).

The government has also moved to dismiss for failure to state a claim under RCFC 12(b)(6). In evaluating a motion to dismiss for failure to state a claim, the court must accept as true a complaint's well-pleaded factual allegations and construe them in the most favorable manner to the plaintiff. *Ashcroft v. Iqbal*, 566 U.S. 662, 668 (2009). The court must draw all reasonable inferences in favor of the non-moving party. *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed Cir. 2001).

To avoid dismissal, a complaint must allege facts "plausibly suggesting (not merely consistent with)" a showing that the plaintiff is entitled to the relief sought. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 556).

### III. DISCUSSION

#### A. Subject-Matter Jurisdiction

The government's Motion to Dismiss under RCFC 12(b)(1) turns on whether the plaintiffs knew or should have known that their land was taken by flooding allegedly caused by the defendant before July 2012. The government argues that the plaintiffs knew or should have known before July 26, 2012 (six years before they filed suit) that: 1) the Corps had already built hundreds of river-training structures in the Mississippi River, which do not affect the Ohio River upstream, and the Corps had already built dams on the Ohio River; 2) the areas surrounding the Mississippi and Ohio Rivers have long been subject to flooding of the same or a similar magnitude and duration; and 3) the plaintiffs knew or should have known about their theory that the river-training structures and Olmsted Dam were responsible for the increase in water-surface elevations.

The plaintiffs allege that their property was permanently taken through recurrent and atypical flooding that was a direct and foreseeable result of the government's action—the Corps' construction of river-training structures and the Olmsted Dam. The plaintiffs allege that their cause of action for a permanent taking accrued "no sooner than 2015," because that was the first year that it was apparent that the cumulative impact of the Corps' river-training structures and dams had caused the plaintiffs' land to be permanently taken, rather than only occasionally inundated, by flooding.

The plaintiffs also argue that their case is preserved under the stabilization doctrine because the Corps has continued to build additional river-training structures in the Mississippi River, and their cumulative impacts have increased water-surface elevations and worsened flooding in the Mississippi and Ohio Rivers, and the construction of the Olmsted Dam on the Ohio River have increased water-surface elevations and worsened flooding there.[13] The

---

[13] The plaintiffs' argument as to the Olmsted Dam was not clear until oral argument. (*See* Tr. at 68:11-22.) On its face, the plaintiffs' Amended Complaint does not adequately raise the claim,

plaintiffs argue that the effects of these river-training structures and the Olmsted Dam did not stabilize and accrue until 2015, so it could not have been clear that "the land had become appropriated for public use" until at least that time, *United States v. Dow*, 357 U.S. 17, 27 (1958), and therefore their claims are timely.

Both parties set forth evidence of the history of flooding, and the plaintiffs' offered declarations from three plaintiffs alleging that the nature of flooding changed in 2015. None of the evidence before the Court, however, refers to the plaintiffs' individual properties. The plaintiffs argue that the government was required to put forth parcel-specific evidence controverting the plaintiffs' allegations of flooding, but the government could scarcely do so when the locations of most of the plaintiffs' properties were not specifically identified in the Complaint or Amended Complaint. While the plaintiffs' allegation that their properties experienced atypical flooding starting in 2015 was not controverted, the Court acknowledges that the government could not controvert that specific allegation without more information about the location of the plaintiffs' properties. It is unfair to disadvantage the plaintiffs by dismissing their claims due to the opaque Amended Complaint. The Court finds that additional facts from the plaintiffs and further development of the record will assist in resolving the question of the timeliness of the claims.

The determination of whether the plaintiffs' claims have already accrued or stabilized is a fact-intensive one. The Court will not resolve these issues on the current record, when it lacks parcel-specific information from both parties. Considering this record, the Court elects to exercise its discretion under RCFC 12(i) to defer consideration of the government's motion to dismiss for lack of subject-matter jurisdiction until trial, when it can make more "detailed findings of fact."[14] *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 29 (2012).

The government points to the allegation in the plaintiffs' original Complaint that the plaintiffs had endured flooding for nine to 10 of the previous 10 years as evidence that the plaintiffs have acknowledged that their claims come too late under the six-year statute of limitations. The plaintiffs' own allegations, since eliminated but not otherwise withdrawn, put the plaintiffs in a difficult posture, but the Court is not prepared at this early stage of the case to reject the entire case and the claims of all the plaintiffs due to this early admission.

Finally, this case is very different from *Jackson-Greenly Farm, Inc. v. United States*, 144 Fed. Cl. 610 (2019). In that case, the plaintiffs challenged the Corps' decision not to rebuild a single failed levy, which they alleged resulted in a taking by flooding, *id.* at 618, whereas the plaintiffs here challenge multiple Corps actions over decades in a broader area that encompasses at least two rivers. The Amended Complaint here suffers from many of the same defects noted in *Jackson-Greenly Farm*, but because it presents more complexity with a greater variety of facts and variables, the Court finds it better to allow for further development of the record.

---

but the Court will consider the claim for purposes of the statute of limitations as if it had been properly alleged.

[14] RCFC 12(i) provides, in pertinent part, that "any defense listed in RCFC 12(b)(1)-(7)— whether made in a pleading or by motion— . . . must be heard and decided before trial *unless the court orders a deferral until trial.*" RCFC 12(i) (emphasis added).

### B. Claim Sufficiency

The government argues that the plaintiffs fail to state a claim because they do not identify the "precise action" that gives rise to a taking and allege a tort instead of a taking. (Def. Mot. at 28, 30, ECF 36.) The Court disagrees.

To prevail in a takings claim, a plaintiff must show (1) "a valid property interest at the time of the taking[,]" such as an ownership or leasehold interest, *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001), and (2) a government "physical invasion or appropriation of private property" that amounted to a compensable taking. *See, e.g.*, *Huntleigh USA Corp.*, 525 F.3d at 1378-79. When plaintiffs have alleged a "nonfrivolous takings claim founded upon the Fifth Amendment, jurisdiction under the Tucker Act is proper." *Moden v. United States*, 404 F.3d 1335, 1341 (Fed. Cir. 2005). The remaining question, then, is whether plaintiffs' complaint "contain[s] sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

The plaintiffs here met the standard for notice pleading to survive a motion to dismiss. The plaintiffs have alleged that they have property interests in land. They also allege that the cumulative effect of the government's river-training structures and dams caused flooding to their properties, which constituted a physical invasion of private property. If these allegations are true, the plaintiffs state a claim upon which relief could be granted. To the extent that the government disagrees with the plaintiffs' allegations, the dispute presents a merits issue thar the government can elucidate in a motion for summary judgment when both parties have provided greater clarity and specificity with respect to each plaintiff.[15]

The government's motion to dismiss for failure to state a claim is denied.

---

[15] The Court notes that at least some of the plaintiffs are unlikely to prevail. For example, one plaintiff apparently owns property near the Tennessee River, about which no allegations have been made. In addition, as noted above at note 13, the plaintiffs' claims regarding the Olmsted Dam are not well-pleaded, putting at risk the claims of the plaintiffs regarding flooding from the Ohio River. The claims of the plaintiffs along the Mississippi River are at risk in light of the plaintiffs' concession at oral argument that the river-training structures in the MMR would have impacts upstream, but not downstream. (Tr. 68:16-22, 70:17-22.) All of these issues are best resolved after further, parcel-specific factual development. The Court will address these specific plaintiffs either on a summary judgment motion or when greater fact-development allows a decision on the government's motion to dismiss under the statute of limitations.

## IV. CONCLUSION

For the reasons stated, resolution of the government's motion to dismiss under RCFC 12(b)(1) is DEFERRED until trial pursuant to RCFC 12(i), and the government's motion to dismiss under 12(b)(6) is DENIED. The Court will schedule a status conference to discuss a schedule for the case moving forward.

It is so **ORDERED**.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**
