# In the United States Court of Federal Claims

No. 18-1099
Filed: August 1, 2024
FOR PUBLICATION

---

**RIVERVIEW FARMS, et al.,**

*Plaintiffs,*

**v.**

**UNITED STATES,**

*Defendant.*

---

*Ethan A. Flint*, *Adam Riley*, Flint Law Firm, LLC, Edwardsville, IL, and *Jamie Robinson*, The Bruno Firm, Chicago, IL, of counsel, for the plaintiffs.

*Laura Williamson Duncan*, *Dustin J. Weisman*, *Ashley M. Carter*, and *Mark Pacella*, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C., for the defendant.

## MEMORANDUM OPINION AND ORDER

***HERTLING**, Judge*

In this takings case, the plaintiffs—landowners with property either bordering or located near the Mississippi or Ohio rivers in Kentucky, Illinois, and Missouri—allege that river-training structures built by the United States Army Corps of Engineers ("Corps") in the rivers have caused atypical flooding amounting to a taking by the United States of a flowage easement on the plaintiffs' property.

The plaintiffs filed their complaint in 2018, and the defendant moved to dismiss. The plaintiffs then filed an amended complaint to remove admissions that, on their face, rendered their claims untimely. In 2019, the defendant moved to dismiss the amended complaint under Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"), arguing that the plaintiffs' claims were untimely and barred under the six-year statute of limitations of 28 U.S.C. § 2501. After oral argument, the Court deferred a ruling pending the filing of a second amended complaint that would set forth more accurately the locations of the plaintiffs' properties. The parties were also directed to undertake jurisdictional discovery.[1] (ECF 53.) The

---

[1] The defendant's concurrent motion to dismiss under RCFC 12(b)(6) for failure to state a claim for relief was denied.

plaintiffs both filed a second amended complaint in January 2020 and identified bellwether plaintiffs on whose claims jurisdictional discovery would focus.

With jurisdictional discovery having concluded, the defendant renews its motion to dismiss the second amended complaint under RCFC 12(b)(1).  The defendant again argues that the plaintiffs have failed to show that their claims are timely.

As the parties developed their evidence during discovery, the plaintiffs narrowed and clarified the bases for their claims.  Based on that evidence, the second amended complaint does not adequately match the nature of the claims espoused in the plaintiffs' opposition to the motion to dismiss, and its allegations are not well-pleaded.  The evidence offered by both parties demonstrates that the plaintiffs knew or should have known about the claims stated in the second amended complaint prior to the expiration of the statute of limitations period on July 26, 2012.  The jurisdictional evidence produced by the parties shows that the plaintiffs have suffered flooding of the nature described in the second amended complaint for decades.  The plaintiffs' claims are therefore untimely.  Dismissal of the second amended complaint, however, will be deferred; although the plaintiffs have already filed three complaints in this case, they will have one final opportunity to plead a timely and viable case by seeking leave to file a third amended complaint.

## I.   PROCEDURAL HISTORY

The plaintiffs filed this inverse-condemnation action against the United States on July 26, 2018.  (ECF 1.)  The defendant moved to dismiss the complaint for lack of subject-matter jurisdiction pursuant to RCFC 12(b)(1) and for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6).  (ECF 9.)  The plaintiffs amended their complaint (ECF 10), and the defendant renewed its motion to dismiss.  (ECF 17.)

Oral argument was held in October 2019.  The motion to dismiss under RCFC 12(b)(6) was denied.  On its RCFC 12(b)(1) motion, the defendant argued the plaintiffs knew or should have known about the flooding that caused the alleged takings prior to July 26, 2012, six years prior to the date on which they sued.  The factual record, however, was not sufficiently developed and lacked parcel-specific information.  As a result, the Court found that it could not rule on the defendant's RCFC 12(b)(1) motion and ordered the plaintiffs to file a second amended complaint.  A ruling on the motion was otherwise deferred to allow the development of a factual record regarding the accrual of the plaintiffs' claims.  *Riverview Farms v. United States*, No. 18-1099C, 2019 WL 6211224, at *4 (Fed. Cl. Nov. 20, 2019) ("*Riverview Farms I*").

The plaintiffs filed a second amended complaint in January 2020.  (ECF 56.)  Due to the number of plaintiffs and properties at issue, the plaintiffs were also ordered to identify eight representative bellwether plaintiffs (ECF 53) on whose claims the parties could focus during jurisdictional discovery; the plaintiffs did so.  (ECF 57.)  Jurisdictional discovery was initially set to close in July 2020, but the pandemic required an extension of the deadline.  The deadline was then extended several times before discovery ultimately concluded in June 2023.

After the close of discovery, the parties participated in a status conference in which the Court proposed holding an evidentiary hearing to resolve factual issues and make credibility determinations.  (ECF 131 at 4:24-5:23.)  In a joint status report following that status conference, the parties instead proposed a briefing schedule for the defendant to renew its motion to dismiss.  (ECF 128.)  They suggested that after the completion of briefing, the parties "could propose issues on which to hold an evidentiary hearing, if necessary."  (*Id.* at 1.)  Neither party proposed any such issues.

In September 2023, the defendant renewed its motion to dismiss.  (ECF 135.)  The plaintiffs responded (ECF 138) and moved both to amend the second amended complaint (ECF 136) and to strike the defendant's expert report of Dr. Jay Brigham (ECF 137).  The defendant replied (ECF 147) and opposed both the motion to amend the complaint (ECF 149) and the motion to strike Dr. Brigham's report (ECF 145).  The motion to strike Dr. Brigham's report was denied in June 2024.  (ECF 154.)  Oral argument was held on June 27, 2024.

## II.   FACTUAL BACKGROUND[2]

Since the early 20th century, the Corps has built training structures in the Mississippi and Ohio rivers to mitigate flooding and improve navigability.  As explained in *Riverview Farms I*, 2019 WL 6211224, at *4, river-training measures have taken different forms between the two rivers.  For completeness, this opinion summarizes the factual history detailed in *Riverview Farms I* and incorporates additional evidence submitted for the current motion.

### A.   The Plaintiffs

The plaintiffs are owners of property located on or near the Mississippi and Ohio rivers in Kentucky, Illinois, and Missouri.  They use their property primarily for farming, though some plaintiffs also live, operate businesses, and/or hunt on their property.  They allege that the river-

---

[2] This recitation of the facts includes findings of fact based on the record developed  by the parties in jurisdictional discovery.  In resolving disputed jurisdictional facts, a court is not "'restricted to the face of the pleadings'" and may review evidence outside the pleadings.  *Shoshone Indian Tribe of Wind River Rsrv., Wyo. v. United States*, 672 F.3d 1021, 1030 (Fed. Cir. 2012) (quoting *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993), *cert. denied*, 512 U.S. 1235 (1994)).  After the completion of jurisdictional discovery, a "court may weigh evidence presented and may make findings of fact pertinent to its jurisdiction." *Kellogg Brown & Root Servs. v. United States*, 115 Fed. Cl. 46, 50 (2014) (citing *Ferreiro v. United States*, 350 F.3d 1318, 1324 (Fed. Cir. 2003)).

training structures the Corps has constructed in the rivers have caused atypical river flooding amounting to a taking of a flowage easement.[3]

The second amended complaint (ECF 56) identifies 145 plaintiffs or groups of plaintiffs. To manage jurisdictional discovery efficiently, the plaintiffs were directed to select eight bellwether plaintiffs as representative plaintiffs on whose claims the parties could focus discovery.  (ECF 53.)  The plaintiffs identified eight bellwether plaintiffs.  (ECF 57.)  During discovery, two of the bellwether plaintiffs were removed from the case.  The plaintiff-specific evidence submitted by the parties and their experts is directed primarily at the six remaining bellwether plaintiffs.

### B.      River-Training Structures

The Corps first began building river-training structures in the Mississippi River in 1910 to "constrict the river channel, concentrate flow, redirect sediment, and deepen and maintain the navigable portion of the channel."  *Riverview Farms I*, 2019 WL 6211224, at *3.  In these early years, the Corps accomplished its river-training goals primarily by constructing "wing dikes." (ECF 56 at ¶ 167.)  Wing dikes are "placed in a river to redirect the river's own energy to provide a variety of effects."  *Dikes*, Applied River Engineering Center (n.d.), https://www.mvs-wc.usace.army.mil/arec/Basics_Dikes.html.  Despite the installation of these structures, the Mississippi River continued to experience severe seasonal floods.  *See Riverview Farms I*, 2019 WL 6211224, at *4.

Beginning in the 1980s, the Corps developed and installed new types of river-training structures, including bendway weirs, chevron dikes, and W- and S-dikes:

- A bendway weir is a "low level, totally submerged rock structure that is positioned from the outside bankline of the riverbend, angled upstream toward the flow."  *Bendway Weirs*, Applied River Engineering Center (n.d.), https://www.mvs-wc.usace.army.mil/arec/Basics_Weirs.html.  By "controlling excessive river depths," bendway weirs "naturally widen[ ]" the "opposite side of the riverbank."  *Id.*
- Chevron dikes are "blunt nosed, arch shape[d]" structures constructed parallel to the flow of the river, near the riverbank.  *Chevrons*, Applied River Engineering Center (n.d.), https://www.mvs-wc.usace.army.mil/arec/Basics_Chevrons.html. They "utilize the energy of the river to redistribute flow and sediment" and, as a

---

[3] In a flowage easement, a riparian owner may "obtain the right to flood the land of others." Jon W. Bruce, James W. Ely, Jr., and Edward T. Brading, *The Law of Easements and Licenses in Land* § 5:37 (2024).  A flowage easement is "one of the rights in the bundle of sticks of property rights that inheres in a *res.*"  *Milton v. United States,* 36 F.4th 1154, 1161 (Fed. Cir. 2022).

result, create "channel deepening, side channel development, and middle bar formation." *Id.*

- Dikes, which include those identified in the complaint as "W-dikes" and "S-dikes" (ECF 56 at ¶ 190), "manage sediment response distribution within the channel to deepen the channel and provide adequate depth for navigation." *Dikes*, Applied River Engineering Center (n.d.), https://www.mvs-wc.usace.army.mil/arec/Basics_Dikes.html.  They vary greatly in height and length and are built perpendicularly to the river's flow.  *Id.*

Most of the nearly 1,600 river-training structures in the Middle Mississippi River were in place by the mid-20th century, and the Corps had constructed more than 90 percent of them by 2000.  *Id.*  The plaintiffs allege that between 1990 and 1993 alone, the Corps constructed approximately 40,000 linear feet of dikes and bendway weirs in the Middle Mississippi River.  (ECF 56 at ¶ 180.)  While the Corps constructed bendway weirs relatively later than the other types of river-training structures, it had built 82 percent of the bendway weirs by 2000.  *Riverview Farms I,* 2019 WL 6211224, at *4.  Similarly, the Corps had built 96 percent of the river-training structures in the Lower Mississippi River by 2000.  *Id.*

River training in the Ohio River also began around 1910, when Congress authorized the Corps to build a navigation channel beginning at the river's source in Pittsburgh, Pennsylvania, at the confluence of the Allegheny and Monongahela rivers, to its confluence with the Mississippi, near Cairo, Illinois.  Neither party offers detailed evidence of river-training structures on the Ohio River like those described on the Mississippi River.  The plaintiffs note in their second amended complaint, however, that the Olmsted Dam, under construction between 1988 and 2018, "has also constricted the Ohio River."[4]  (ECF 56 at ¶ 248.)  *See* David Murray, *Olmsted Locks and Dam Formally (And Finally) Dedicated*, Waterways Journal, (August 30, 2018) https://www.waterwaysjournal.net/2018/08/30/olmsted-locks-and-dam-formally-and-finally-dedicated/.)  They also allege that in the Upper Ohio River, where previously placed structures have been removed, "flood levels have significantly decreased, returning to historic levels."  (ECF 56 at ¶ 252.)  Additionally, the plaintiffs allege that water levels on the Mississippi River can affect flooding patterns on the Ohio River near the confluence of the two rivers.  (*Id.* ¶ 258.)

---

[4] A dam is obviously a river-training structure of a different nature than those placed in the Mississippi River, and it is neither alleged nor self-evident why a dam would have the same alleged effects on river levels as the river-training structures in the Mississippi, like dikes and weirs, that otherwise form the basis of the plaintiffs' claims.  The plaintiffs' glossing over of the distinction between the two types of structures is another aspect of why the second amended complaint, jumbling property-owners on both rivers together when the structures potentially at fault are different, is not well-pleaded.

### C.   River Gages

River gages in Paducah, Kentucky and Cairo, Illinois offer objective, consistent measurements of water levels; these gages serve as reference points to estimate water levels on the plaintiffs' properties.  Each gage site uses as its starting point a "gage datum," which is a static, site-specific reference point typically located underneath a river's streambed.  *See* Lynne Fahlquist & Candice Hopkins, *Why We Use Gage Height*, United States Geological Survey (April 23, 2024) https://waterdata.usgs.gov/blog/gage_height/.  From the gage datum, the "gage height" can be determined by measuring the height of the water above the gage datum.  *Id.*  River gage evidence produced by the parties reflects daily readings at the Paducah gage from 1967 to 2018 and at the Cairo gage from 1930 to 2018.  The two hydrographs below chart the daily water levels at the Paducah and Cario gages.  (ECF 135-6.)



Source: Flood Ana Observed Stage_Bellwether Depositions.xlsx



Source: Flood Ana Observed Stage_Bellwether Depositions.xlsx

### D.   The Plaintiffs' Flooding Claims

In their original complaint, the plaintiffs alleged that the Corps "has been reshaping the Mississippi, Ohio, and other Midwestern rivers to facilitate navigation for the past 150 years." (ECF 1 at ¶ 6.)  The river-training structures used to reshape the rivers, they alleged, have increased the water-surface elevation on the plaintiffs' properties and have caused "atypical flooding events during 10 of the last 10 years."[5]  (*Id.* ¶ 13.)  In the first amended complaint, the plaintiffs maintained their allegation that the Corps has been reshaping the flow of the rivers for the past 150 years, but they removed their allegation that this reshaping had caused atypical flooding on the plaintiffs' properties in 10 of the last 10 years.  (ECF 10 at ¶¶ 2-10.)  The plaintiffs alleged that the river-training structures installed by the Corps on the Mississippi and Ohio rivers had caused atypical flooding of their property amounting to the taking of a flowage easement.  They further alleged that the government's gage data showing no change in flooding

---

[5] While this case concerns the plaintiffs' second amended complaint and only the allegations presented therein will dictate the outcome of the motion to dismiss, statements made in an earlier complaint are still "admissions" of the party.  *Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705, 707 (2nd Cir. 1989) ("The amendment of a pleading does not make it any the less an admission of the party."); *United States v. McKeon*, 738 F.2d 26, 31 (2nd Cir. 1984) ("A party thus cannot advance one version of the facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in story.").

was "generic" and therefore inadequate to demonstrate that the plaintiffs had not experienced a taking. *Riverview Farms I*, 2019 WL 6211224, at *6.

In their second amended complaint, the plaintiffs again allege that river-training structures have increased flood levels by causing "atypical flooding." (ECF 56 at ¶ 6.) The plaintiffs allege that the inundations they have experienced at their properties have, in recent years, occurred "with greater frequency, for longer durations, and at unusual times of year" in deviation from "historical flooding patterns." (*Id.*) The second amended complaint does not specify when such atypical flooding occurs. The plaintiffs have consistently admitted that the rivers historically have routinely flooded from January to April. Thus, logically, the atypical flooding of which the plaintiffs complain must occur during the remainder of the year, but it could be at any time of the year, and no facts are alleged to limit or define when the atypical flooding occurs. The only temporal reference in the second amended complaint refers to the possibility that releases from the Tennessee and Barkley dams "could increase flood levels along this reach of the river (presumably the Ohio River, but unclear from the complaint), particularly atypical flooding in the fall or winter." (*Id.* ¶ 245.) Otherwise, the second amended complaint is silent as to when the alleged "atypical flooding" occurs.

Under the plaintiffs' theory of causation, the impact of the accretion of river-training structures on water levels has been cumulative. They identify two causal mechanisms that allegedly magnify flooding on their properties. First are "upstream" factors which include "potential climate change, land-cover change, and any dams present upstream on the river or its tributaries." (*Id.* ¶¶ 238-239.) Second are "instream" factors which include "alterations of the river channel or floodplain, . . . which change how floodwaters are conveyed through a given stretch of river." (*Id.* ¶ 240.) More structures, they allege, have caused more flooding. That pattern accelerated in the 1980s, when the Corps began installing bendway weirs, which "have many times the flood impact of wing dikes." (*Id.* ¶ 206.) In areas where structures have been removed, however, the plaintiffs allege that "flood levels have significantly decreased, returning to historic levels." (*Id.* ¶ 252.) In areas that never had structures, "flood levels and [water surface elevation] increased little or not at all." (*Id.* ¶ 251.)

During consideration of the motion to dismiss the first amended complaint in *Riverview Farms I*, the precise location of nearly 70 percent of the plaintiffs' parcels could not be determined because the first amended complaint was too vague. *Riverview Farms I*, 2019 WL 6211224, at *6. The parties' jurisdictional discovery has produced that information, and the plaintiffs attached to their second amended complaint a full list of properties on which they allege atypical flooding. (*See* ECF 56-1.)

### E.      Expert Reports

As part of jurisdictional discovery, the parties submitted expert reports modeling historical flood data from three experts in hydraulic modeling. Additionally, the defendant submitted an expert report from a historian, who opined on the historical public perception of flooding trends in the relevant communities.

### 1.    Dr. Nicholas Pinter

Dr. Pinter, a professor of geoscience at the University of California Davis, submitted a report on the plaintiffs' behalf.  (ECF 138-2.)  Although the complaint does not allege temporally limited atypical flooding, the plaintiffs asked Dr. Pinter only to "assess the timing and magnitude of July flooding" at the bellwether properties.  (*Id.* at 4.)  Dr. Pinter and his team built a model that considered water flow, parcel-specific topography, the placement of river-training structures, levee elevations, and other locationally specific data.  (*Id.* at 5-7.)  For each bellwether plaintiff, they reported data using four metrics: (1) years-per-decade with July flooding; (2) cumulative number of July days with flooding, per decade; (3) average maximum flood depth in each July; and (4) cumulative daily flood depths at each parcel.  (*Id.* at 11.)

Ultimately, Dr. Pinter concluded that flooding at the bellwether properties was "higher during 2009-2018 than during any previous period of the hydrologic record."  (*Id.* at 2.)  The models showed that "by every metric of flood frequency, duration, and depth, . . . the metrics of July flooding during 2009-2018 are unprecedented."  (*Id.* at 14.)  Of course, Dr. Pinter could not opine about any time of year aside from July, because the plaintiffs' counsel had instructed him to look only at July.

### 2.    Mr. Marty Teal

The defendant submitted an expert report from Mr. Teal, a hydraulic consultant from WEST Consultants, Inc. ("WEST").  (ECF 135-5.)  Like Dr. Pinter's report, Mr. Teal's report detailed the results of a model quantifying flooding on the bellwether properties "based on various metrics, such as frequency and extent."  (*Id.* at 8.)  Mr. Teal's study used a "software package of a study area encompassing plaintiff properties" to create the geographically specific data on which his model relied.  (*Id.*)  The model simulated flooding data for the periods 1995-1998, 2008-2011, 2012-2014, and 2015-2018.  (*Id.*)  Mr. Teal then produced a comparison of flood data pre- and post-July 2012—the determinative statute of limitations date for this suit.  (*Id.*)

Mr. Teal determined that "[s]tage hydrographs, inundation maps, tables, and other means of quantifying flooding" indicate that flooding in the pre- and post-2012 periods "was very similar for all parcel areas."  (*Id.*)  To corroborate WEST's modeled data, Mr. Teal also studied aerial photographs of the bellwether parcels before and after 2012.  (*Id.* at 31.)  Those photographs show that the pre- and post-2012 flood extents were "nearly the same."  (*Id.* at 9.)  Based on his analysis of all of WEST's data, Mr. Teal concluded that "many of the bellwether plaintiff parcels have experienced flooding for many years, including before July 26, 2012."  (*Id,* at 9.)

In a rebuttal report, Dr. Pinter criticized Mr. Teal's report for "selectively simulat[ing] only four years immediately preceding 2012 (2008 to 2011), skipp[ing] the nine years from 1999 to 2007 and add[ing] simulations for the years 1995-1998 to the pre-2012 side of the comparison." (ECF 138-5 at 15.)  According to Dr. Pinter, Mr. Teal instead should have "done a symmetrical comparison of the periods before and after 2012, by adding simulations for 2006 and 2007 to [WEST's] model run for 2008 to 2011."  (*Id.*)  This omission skewed the WEST

data favorably toward the defendant because the excluded 2006 and 2007 data show relatively dry years.  (*Id.*)  Dr. Pinter further questioned the accuracy of Mr. Teal's report due to both an alleged modeling error (*id.* at 18-19) and Mr. Teal's use of outdated software (*id.* at 27).

### 3.    Dr. Robert Holmes

In response to Dr. Pinter's report, the defendants submitted a report from Dr. Holmes, a principal of Holmes Engineering, LLC, and formerly a hydrologist with the United States Geological Survey.  (ECF 135-10 at 2-148.)  Dr. Holmes reviewed Dr. Pinter's report and concluded that "by lumping 2009 to July 26, 2012, in with flooding after July 26, 2012, Dr. Pinter's opinion . . . obscures the flooding in 2008, 2010, and 2011 and does not aid in comparing the extent of flooding on the bellwether properties before and after July 26, 2012. (*Id.* at 82.)

Dr. Holmes cited four reasons for his conclusion.  First, he explained that errors in Dr. Pinter's model commonly render the results incorrect by five to 10 feet, and sometimes by up to 15 feet.  (*Id.* at 12.)  Moreover, these errors display a positive trend in that the "difference[s] between the model estimates and observed data increase over time and are greater in the later years."  (*Id.* at 13.)  Second, Dr. Holmes's findings reflect "frequent flooding throughout the years prior to July 26, 2012."  (*Id.* at 13.)  Dr. Pinter's July-only flooding analysis depicts only a fraction of the overall flooding that occurred prior to 2012.  Even looking at that analysis, however, Dr. Holmes reported that "July flooding occurred on all properties" prior to 2012.  (*Id.* at 14.)  Third, while Dr. Holmes determined that Dr. Pinter's results were unreliable due to modeling errors, he opined that even those results "show that the [b]ellwether properties experienced flooding prior to July 26, 2012."  (*Id.* at 12.)  Dr. Holmes specifically noted that anomalous July flooding had occurred in 1973 and 1993.  (*Id.* at 15.)  Fourth, Dr. Holmes explained that Dr. Pinter's analysis does not facilitate analysis of flooding immediately before and after July 2012.  Because Dr. Pinter grouped the results in 10-year blocks, including 2009-2018, one cannot determine precisely when, in relation to July 26, 2012, the flooding Dr. Pinter identified as having occurred during the period he analyzed took place.  "Further, computing statistics for 2009 to 2018 and making [an] artificial split between 2008 and 2009 obscures the fact that three of the four years prior to 2012 (i.e., 2008, 2010, and 2011) had flooding in July on some [b]ellwether properties."  (*Id.*)

### 4.    Dr. Jay Brigham

The defendant retained Dr. Jay Brigham to "review historical documents and write a report examining the history of flooding on the Ohio and Mississippi Rivers and the public's—including the bellwether plaintiffs'—potential knowledge of the flooding."  (ECF 135-14 at 4.) Dr. Brigham conducted archival research at National Archives and Records Administration facilities in Maryland and Georgia.  Dr. Brigham's research team also visited the Corps' district offices, historical office, and research and development center.  (*Id.*)  Additional research came from archival websites Newspapers.com, Ancestry.com, and the Corps' website.  (*Id.*)  In total, the team reviewed approximately 5,300 documents in preparing its report.  (*Id.*)

10

Dr. Brigham's research led him to offer four opinions.  First, documents indicate a history of flooding of the Mississippi and Ohio rivers in the areas near Paducah, Kentucky and Cairo, Illinois.  (*Id.*)  These areas cover the bellwether properties, and the data date back to the years immediately following the Civil War.  (*Id.* at 5.)  Second, documentation dating to 1935 shows summer flooding (May, June, and July), and the public expressed concerns about these floods "as early as 1991 and continuing into the 2010s."  (*Id.*)  Third, newspapers and documents collected with the Mississippi River Commission's annual high-water and low-water inspection trips beginning in 1970 discussed seasonal flooding on the rivers.  (*Id.*)  Additionally, local newspapers published photographs depicting the extent of those floods.  (*Id.*)  Fourth and in summary, Dr. Brigham concluded that the evidence shows a long history of flooding that received "significant public attention . . . in local press and public meetings."  (*Id.*)  Landowners, therefore, "were aware or should have reasonably been aware of the area's flooding history."  (*Id.*)

### F.     Plaintiff-specific facts

When the Court deferred a ruling on the defendant's 12(b)(1) motion to dismiss in *Riverview Farms I*, it did so in part because plaintiff-specific flooding data was needed to determine when the plaintiffs' claims accrued.  The plaintiffs ultimately relied on and submitted evidence for the six remaining bellwether plaintiffs, all soybean and corn farmers who monitor flood conditions as part of their farming operations.

### 1.     Island Farms, LLC

Island Farms owns approximately 2,500 acres of land bordering the Mississippi River on Wolf Island, Kentucky.  (ECF 135 at 36.)  Island Farms acquired these parcels between July 2016 and November 2017, and it sold them all in 2021.  (*Id.*)  When it owned the parcels, the legal entity "Island Farms" consisted of four owners.  One of these owners, Jeff Davis, represents Island Farms for purposes of this case.  (*Id.*)  Mr. Davis has lived in the area since 1958 and began farming "in the vicinity" in 2004.  (ECF 138 at 39.)  In his deposition testimony and interrogatory answers, he described his perception of growing conditions in the area based on his experiences farming both the Island Farms parcels and other nearby properties.  He explained that a typical growing season begins with planting corn from the beginning of April until the middle of May, when soybean planting begins.  (ECF 135 at 37.)

Mr. Davis testified that the Island Farms South properties begin to flood when the Cairo gage reaches roughly 40 feet.  (ECF 135-3 at 107.)  He emphasized, however, that flooding takes place on his land gradually; it is not the case that the land is dry at 39.5 feet and inundated at 40 feet.  (*Id.*)  In Mr. Davis's experience farming in the area, spring flooding "had always been a common occurrence, but flooding in July was an anomaly."  (ECF 138 at 40.)  Noting that spring flooding tended to occur cyclically in the area, he explained that "you sort of get call[o]us to normal flooding," and it was not until July flooding became a common occurrence that he noticed changes in flooding that compelled him to investigate.  (*Id.* at 42.)  He recalled several specific instances of July flooding on other nearby properties in 2011 and 2013, and a particularly catastrophic flood in July 2015 in which he had to navigate his fields by boat.  He

"began to suspect that the [Island Farms South] properties had been taken by flooding" when he discovered sand deposits on the property in the Fall of 2016.  (*Id.*)

### 2.    Mr. Coy Buchanan

Mr. Buchanan is a fourth-generation farmer who has farmed the parcels at issue in this case for his entire life.  (*Id.* at 44.)  He owns three groups of parcels: one group on the Ohio River near its confluence with the Mississippi River, one on the Mississippi River near its confluence with the Ohio River, and a third group, at a higher elevation, that never floods.  (ECF 135 at 45.)  A map of river-training structures near Mr. Buchanan's properties reveals that "most . . . are at least several decades old."  (*Id.*)  Mr. Buchanan's corn and soybean farming operations require him to "'watch the weather, watch the river, and know" when flooding has concluded for the year.  (*Id.*)  He testified that his property begins to flood when the Cairo gage reaches 38 feet (ECF 135-3 at 47).  Water completely covers his land beginning when the Cairo gage is around 42 feet.  (*Id.*)  In the "late 80's to early 90's" he used to plant corn on his river-bottom properties, but flooding has caused him to shift exclusively to soybeans on those properties.  (ECF 135 at 46.)

As Mr. Davis did for Island Farms, Mr. Buchanan testified that "[w]inter and spring flooding of varying duration has always been a common occurrence" on his properties, but July flooding was anomalous.  (ECF 138 at 44.)  At the same time, he acknowledged that "summer flooding on his property is cyclical, in that he may go four to five years without any such flooding, experience it two years in a row, and then not flood again for several years."  (ECF 135 at 46.)  Like Mr. Davis, Mr. Buchanan recalled three specific instances of July flooding in 2011, 2013, and 2015.  (*Id.* at 45.)  In each year, he lost his entire crop.  July floods are particularly disastrous for corn and soybean farmers because there is no time to replant the crops after a July flood subsides.  (ECF 138 at 48.)  Mr. Buchanan began investigating the source of the uncharacteristic July floods after the 2015 flood, which he testified was more severe than any other July flood he had previously experienced.  (*Id.*)  It was after the July 2015 flood that July flooding began to stand out from the flooding that commonly occurred in May or June.

### 3.    Riverview Farms

Riverview Farms, represented by managing partner John Myers, was formed in 1989 and consists of a group of parcels on and near the Ohio River.  (ECF 135 at 49.)  There are no river training structures within 10 miles of the properties.  (*Id.*)  Riverview Farms follows the same corn and soybean planting schedule as Island Farms and Mr. Buchanan: corn is planted from April to May, followed by soybeans later in May.  (*Id.* at 49-50.)  Mr. Meyers testified in his deposition that "'the [floods] that affect us are the ones when we get past the planting date of corn, and then with the beans.'"  (*Id.* at 50 (quoting Mr. Meyers's deposition).)

Mr. Myers testified that Riverview Farms floods cyclically in the winter and spring.  He also testified that his properties experienced anomalous July flooding in 2011, 2013, and 2015.  (ECF 138 at 49-50.)  He recalled that each flood caused "significant damage to crops."  (*Id.* at 49.)  Mr. Meyers testified that it took several years to suspect that the flooding may be tied to river-training structures because the daily gage readings from water gages in Paducah and Cairo

indicate a "90-year history of ups and downs that would obscure any upward trend." (*Id.* at 51.) The new, biennial July floods beginning in 2011, however, "alerted [Mr.] Myers to a change in the flooding patterns on Riverview Farms" and "prompted him to investigate a potential claim." (*Id.* at 50.)

### 4.   Mr. Michael Boatwright

Mr. Boatwright, a lifelong Paducah resident, owns six parcels, spanning 1,100 acres of farmland that comprise Boatwright Farms.  Mr. Boatwright farms on three parcels along the Ohio River ("river-bottom parcels"); maintains two multiuse parcels, "just beyond" the river-bottom parcels, protected by a flood wall, on which he stores farm equipment and has a house, barn, and shop; and owns a final parcel that is not near any of the river-training structures involved in this case.  (ECF 135 at 53.)

Mr. Boatwright monitors flooding patterns as part of his routine farming operations and has long recognized yearly flooding cycles on his property.  He testified that he uses the water levels at the Paducah gage to determine the extent of flooding on his properties.  (ECF 135-3 at 26-27.)  For example, when the Paducah gage reaches 30 feet, he knows that roughly "200 acres total" of his property will be inundated.  (*Id.* at 27.)  Based on this benchmark, Dr. Holmes calculated that the lowest areas of Mr. Boatwright's property flood when the Paducah gage reaches 21.5 feet.  (ECF 135-10 at 50.)  Mr. Boatwright testified that spring flooding "has been an almost yearly occurrence since he began farming," and the onset of and duration of the floods varied.  (ECF 138 at 33.)  Despite these regular springtime floods, Mr. Boatwright stated that flooding did not frequently extend into June, and July flooding was an anomaly.  (*Id.*)  He recalls the same July flooding patterns as other bellwether plaintiffs: increasingly severe floods occurred in 2011, 2013, and 2015.  (*Id.*)  Over time, changing flood conditions have required Mr. Boatwright to change his farming habits.  The last time he planted wheat on his river-bottom properties was in 2010, and he stopped planting corn in 2013.  (ECF 135 at 54.)  Because of cyclical flooding patterns, however, it took "a dramatic pattern of recurring July floods" to alert Mr. Boatwright that he should investigate whether he had a claim for atypical flooding.  (ECF 138 at 36.)

### 5.   Mr. John LaFont

Mr. LaFont has lived in Massac County, Illinois since 1973.  He owns parcels on and near the Ohio River for farming corn, soybeans, and sorghum.  (*Id.* at 53.)  The closest river-training structure to any of Mr. LaFont's parcels was built in 1983 and is four miles upstream.  (ECF 135 at 58.)  Mr. LaFont has dealt with flooding on his land for decades.  He testified that the lowest portions of his properties begin to flood when the Paducah gage reaches 28 feet.  (ECF 135-3 at 9 (LaFont deposition testimony).)  When his family began farming the area in the early 1970s, spring flooding was a common occurrence.  (ECF 135 at 58.)  The trend continued into the 21st century, and in 2003, Mr. LaFont reported to a local newspaper that his family was "at risk of losing most of their acreage" to anticipated flooding.  (*Id.*)

Mr. LaFont recalls July flooding in 2011, 2013, and 2015.  At its worst, at least two-thirds of his property was flooded.  (ECF 138 at 53.)  As with other bellwether plaintiffs, the

gage data relevant to Mr. LaFont's properties reflect the occurrence of cyclical flooding over 50 years that Mr. LaFont claims "obscured any perception of an upward trend." (*Id.* at 55.) After the July floods of 2011, 2013, and 2015, which Mr. LaFont testified were new, he "kind[ ] of woke up and realized that something's changing." (*Id.* at 53.) These floods stood out in their impact on Mr. LaFont's growing season because July is "too late to plant and make a profit," and because there had never been a pattern of July flooding akin to the 2011-2015 period. (*Id.* at 56.) After these years of flooding, Mr. LaFont realized he should investigate a claim.

### 6. Mr. Matthew Morrow

Mr. Morrow's family began farming in the region near Cairo in 1949. (*Id.* at 28.) He now farms in the Wolf Island region and uses about half of the parcels subject to this suit for farming corn and soybeans or for hunting. (*Id.* at 28; ECF 135 at 41.) The other parcels have been part of the Department of Agriculture's Wetland Reserve Program since 2012. (ECF 135 at 41.) Most of the river-training structures near Mr. Morrow's land have been in place for several decades. (*Id.*)

As part of his routine farming operations, Mr. Morrow monitors flood patterns. He testified that "'there's always been flooding'" between May and July, but that the "'problem occurs when [the flooding] substantially endures into July.'" (*Id.* (quoting Mr. Morrow's deposition testimony).) Although Mr. Morrow recalls that his properties experienced July flooding in 1993, 2000, 2011, and 2013, it was not until the 2015 July flood that the flooding inflicted any financial impact on his harvest. (*Id.*) Flooding at his property begins when the Cairo gage reaches 38 or 40 feet. (ECF 135-3 at 76.) After weathering 2015's uniquely severe flood, Mr. Morrow began to investigate a potential claim. (ECF 138 at 28.)

## III. JURISDICTION AND STANDARD OF REVIEW

The Tucker Act, 28 U.S.C. § 1491(a), vests in the Court of Federal Claims jurisdiction over claims for money damages against the United States. The Tucker Act confers jurisdiction on the Court of Federal Claims to hear suits for compensation under the fifth amendment's Takings Clause. *Boling v. United States*, 220 F.3d 1365, 1370 (Fed. Cir. 2000). Under the applicable statute of limitations, 28 U.S.C. § 2501, plaintiffs must bring such suits within six years of the accrual of their claim. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130 (2008). In a takings action, that accrual occurs when "'all the events which fix the government's liability have occurred *and* the plaintiff was or should have been aware of their existence.'" *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1359 (Fed. Cir. 2013) (emphasis in original) (quoting *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988)). The plaintiffs bear the burden of establishing subject-matter jurisdiction, "including jurisdictional timeliness." *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998). They must do so by a preponderance of the evidence. *Reynolds v. Army & Air Force Exchange Service*, 846 F.2d 746, 748 (Fed. Cir. 1988).

The defendant has moved to dismiss the plaintiffs' second amended complaint for lack of subject-matter jurisdiction pursuant to RCFC 12(b)(1). It argues that the plaintiffs' claims accrued before July 26, 2012—six years before the plaintiffs filed their first complaint. Under RCFC 12(b)(1), a "court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). When a plaintiff's asserted jurisdictional facts are challenged, only those factual allegations that the defendant does not controvert are accepted as true. *Shoshone Indian Tribe of Wind River Rsrv., Wyo. v. United States*, 672 F.3d 1021, 1030 (Fed. Cir. 2012). A court is not "'restricted to the face of the pleadings'" in resolving disputed jurisdictional facts and may review evidence outside the pleadings. *Id.* (quoting *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993), *cert. denied*, 512 U.S. 1235 (1994)). In resolving a motion to dismiss, evidence relevant to the jurisdictional issues raised by the motion to dismiss may be considered, and the trial court may make findings of fact to resolve the jurisdictional dispute. *See Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 326 (6th Cir. 1990) (a trial court may "weigh the conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or does not exist").

## IV.   DISCUSSION

The second amended complaint alleges that government action on the Mississippi and Ohio rivers caused "substantial, frequent, and inevitably recurring flooding" which amounted to the taking by the government of "flowage easements over Plaintiffs' property without just compensation." (ECF 56 at ¶¶ 1, 11.) The flooding interfered with the plaintiffs' "distinct, reasonable, investment-backed expectations that their property would only be subject to flooding in line with the historical hydrograph" of the rivers. (*Id.* ¶ 268.) Instead of following the hydrograph data, however, "atypical flooding has and will continue to significantly interfere" with the plaintiffs' interests in their land. (*Id.* ¶ 269.)

In its renewed motion to dismiss, the defendant challenges only subject-matter jurisdiction pursuant to RCFC 12(b)(1). It does not renew its RCFC 12(b)(6) motion for failure to state a claim. Determining whether the Court of Federal Claims has subject-matter jurisdiction over the second amended complaint requires determining whether the plaintiffs' claims arose during the statutory period, within six years of the date of the suit, thus after July 26, 2012. At the motion to dismiss stage, the plaintiffs' underlying claim that they have suffered a taking is accepted as true. Nonetheless, the burden is on the plaintiffs to demonstrate that they neither knew nor had any objective reason to know that they had suffered a taking caused by the river-training structures prior to the limitations period.

In opposing the defendant's motion to dismiss, the plaintiffs' opposition to the motion focuses specifically on the factual assertion, not specifically pleaded, that within the statute of limitations period, they have suffered increased flooding, amounting to a taking, during the month of July. To support their now-limited factual assertions, the plaintiffs rely on Dr. Pinter's expert report analyzing only July flooding and the deposition testimony of the bellwether plaintiffs. All the bellwether plaintiffs testified in their depositions that their properties historically experience regular flooding in the winter and spring months, but that flooding in July was practically nonexistent prior to the statutory period.

The problem with the plaintiffs' claims of novel July flooding arising within the limitations period is that the second amended complaint (and, for that matter, the initial complaint and the first amended complaint) is silent about such flooding. The arguments the plaintiffs present in their briefs, therefore, have not been alleged or otherwise pleaded. Instead, the second amended complaint appears to reflect a theory in search of facts to support it. The plaintiffs now appear possibly to have stumbled on such facts, but their pending complaint is inadequate to state such claims because it does not put the defendant on notice of its new claims of July-only flooding. *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 545 (2007) (citing Fed. R. Civ. Pro. 8(a)(2)) (A complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests"). Instead, it makes allegations regarding "atypical" flooding, which, without further temporal specificity, presumably describe flooding at any time of the year outside of the acknowledged winter-flooding season.

In response to the motion to dismiss, the plaintiffs have produced the deposition testimony of the bellwether plaintiffs and Dr. Pinter's report to support the existence of novel July flooding since 2011, including in 2013 and especially 2015. The plaintiffs argue that it is this recent flooding in July that constitutes the "atypical flooding" of which they complain, and because it is new, they were only put on notice that they needed to inquire into the cause of the unprecedented July flooding in 2015.

Skepticism of the plaintiffs' argument and evidence is warranted. If the July flooding of which the bellwether plaintiffs now complain put them on notice of a change in conditions and gave rise to this suit, one might reasonably expect that somewhere in the plaintiffs' three versions of their complaint they would have mentioned July flooding as the premise of their suit. One looks in vain, however, for any mention of flooding in July as the trigger for this suit, or the basis on which the plaintiffs were put on notice that the nature of the flooding their properties endure has changed. In the second amended complaint, the closest the plaintiffs can come is to allege a taking by "atypical flooding," which the plaintiffs broadly define as flooding with "greater frequency, for longer durations, and at unusual times of year." (ECF 56 at ¶ 6.) Thus, the governing complaint's allegation of "atypical flooding" lacks any temporal specificity and makes no mention of flooding in July or during the summer.

By all appearances, the plaintiffs had a theory of a case, presumably predicated on Dr. Pinter's theories, which he has been advocating for many years, since long before 2012. The plaintiffs' theory needed facts to support it. Three times now the plaintiffs have attempted to marry their theory with any facts that might plausibly support the theory. Three times now they have failed to allege facts necessary to support that theory. At least now they finally appear to have found a factual claim that might plausibly support their theory. (To be clear, the Court is not dismissing the complaint based on the plaintiffs' failure to state a claim. This discussion is included to identify weaknesses in the current complaint that the plaintiffs may wish to address if they opt to seek leave to file a fourth complaint.)

In its motion to dismiss, the defendant argues that the plaintiffs' claims accrued more than six years before they filed their suit on July 26, 2018. The defendant argues that, for the plaintiffs' claims to be timely, the plaintiffs "would have to prove, by a preponderance of the evidence, that the events that fix the United States' liability did not occur before July 26, 2012."

(ECF 135 at 17.)  The plaintiffs cannot meet their burden, the defendant explains, because they "allege broadly that the Corps' more-than-100-year-old practice of building river training structures in the Mississippi River effected a taking by raising water surface elevations . . . and thereby flooding their properties."  (*Id.*)  The defendant relies on this history, the undisputed gage data, the parties' expert reports, and the plaintiffs' own admissions, to argue that the plaintiffs "knew or should have been aware" that their claims accrued more than six years before their suit.  (*Id.*)  As to causation, the defendant argues, the plaintiffs "knew or should have known about the (incorrect) theory connecting flooding and river-training structures," because that theory has been "presented in numerous publicly-available sources for decades."  (*Id.*)

The facts marshaled to support the defendant's argument, however, also serve to undercut that argument.  In addition to the causation argument, the defendant asserts that the plaintiffs have not actually suffered from an increase in flooding, and that the patterns of flooding, including atypical flooding, have not changed for many years.  If that assertion is true, it undercuts the argument that the plaintiffs' claims are untimely; if the plaintiffs have not suffered from an increase in the frequency or severity of atypical flooding, then they did not know and could not reasonably have known that they were harmed.  The facts produced by the defendant about the frequency and severity of the flooding go a long way towards undermining the plaintiffs' claims on the merits, but, in that respect, they must be ignored in considering the motion to dismiss on timeliness grounds.  The defendant's evidence can be considered only in relation to the jurisdictional defense.  In that respect, the defendant emphasizes that most of the river-training structures that the Corps has introduced into the rivers have been in place since long before the onset of the limitations period.

Responding to the defendant's motion, the plaintiffs argue that "it is not periodic flooding over several decades" that caused the taking.  Instead, they argue that "the cumulative effects of the Army Corps' [s]tructures caused a recent increase in the frequency and severity of flooding" on the plaintiffs' properties "during atypical times of year."  (ECF 138 at 16; *see also* ECF 56 at ¶ 6.)  The plaintiffs argue that they could not have known about the increase in frequency and severity of the atypical flooding, now defined by the plaintiffs as occurring in July, until 2015, "when there were several years of flooding that caused Plaintiffs to lose crops, and lose access to their properties."  (ECF 138 at 16.)

### A.    General Principles of Claim Accrual

A claim for a taking accrues "'only when all the events which fix the government's liability have occurred *and* the plaintiff was or should have been aware of their existence.'"  *Casitas Mun. Water Dist.*, 708 F.3d at 1359 (emphasis in original) (quoting *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988)).  A fifth-amendment takings claim typically "'accrues when the taking *action* occurs.'"  *Goodrich v. United States*, 434 F.3d 1329, 1333 (Fed. Cir. 2006) (emphasis added) (quoting *Alliance of Descendants of Tex. Land Grants v. United States*, 37 F.3d 1478, 1481 (Fed. Cir. 1994)).  A takings claim will not accrue, however, if the plaintiff did not know and should not have known that the claim existed.  *Goodrich*, 434 F.3d at 1333.  Determining whether a plaintiff knew or should have known about a takings claim is an objective inquiry.  A plaintiff "does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue."  *Fallini v. United* States, 56 F.3d

1378, 1380 (Fed. Cir. 1995), *cert. denied*, 517 U.S. 1243 (1996) (citing *Menominee Tribe v. United States*, 726 F.2d 718, 721 (Fed. Cir.), *cert. denied*, 469 U.S. 826 (1984)).

      To determine when a party "knew or should have known" about its claim, courts examine the context in which the alleged taking occurred.  The Federal Circuit has determined that plaintiffs knew or should have known about their claims when the taking, allegedly due to the government's action, had been part of the public consciousness well before the statute of limitations period.  *See Jackson-Greely Farm, Inc. v. United States*, 857 F. App'x. 1021, 1027 (Fed. Cir. 2021) (affirming a finding that plaintiffs on the Middle Mississippi River should have known about their claims long before they sued because the impact of river-training structures on flood levels had been in academic and public discussion for decades prior to the suit).  Courts have also found that a plaintiff knew or should have known about the claim before the limitations period by relying on evidence that the plaintiff had corresponded with others about the potential claim.  *See John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1360 (Fed. Cir. 2006) (finding that letters exchanged threatening suit against the defendant indicated the plaintiff knew or should have known about the claim more than six years prior to filing), *aff'd*, 552 U.S. 130 (2008).

      When the government action causing the taking is not immediately perceptible by the landowner, courts apply the stabilization doctrine, established by the Supreme Court in *United States v. Dickinson*, 331 U.S. 745, 749 (1947).  In *Dickinson*, a case about flooding resulting from rising river levels attributable to a dam, the Supreme Court explained that "when the [g]overnment chooses not to condemn land but to bring about a taking by a continuing process of physical events," the claim does not accrue until "the consequences of inundation have so manifested themselves that a final account may be struck."  *Id.*  As the Federal Circuit has explained, a claim accrues under the stabilization doctrine "once it is clear that the process has resulted in a permanent taking and the extent of the damage is reasonably foreseeable."  *Boling*, 220 F.3d at 1371.  Thus, although the plaintiffs do not need to file suit when they first suspect a taking, eventually the "uncertainties must give way to the unmistakable fact that land" conditions have changed amounting to a taking.  *Boling*, 220 F.3d at 1373 (finding that although erosion damage that initially took mere inches of the plaintiffs' land did not require the plaintiffs to file suit immediately, the claims accrued when the erosion "substantially encroached the parcels at issue").

      The stabilization doctrine serves both to expand and to limit plaintiffs in pursuing claims for a taking: the statute of limitations does not begin to run the moment the government takes initial action that begins a gradual takings process, but plaintiffs may not wait to bring suit "until any possibility of further damage has been removed."  *Columbia Basin Orchard v. United States*, 116 Ct. Cl. 348, 357 (1950).  It is "'the uncertainty surrounding the permanent nature of the taking, not the uncertainty surrounding the ultimate extent of the [ ] damage, that is critical in determining whether the situation has stabilized.'"  *Jackson-Greely Farm, Inc. v. United States*, 144 Fed. Cl. 610, 624 (2019) (quoting *Boling*, 220 F.3d at 1372), *aff'd*, 857 Fed. App'x. 1021 (Fed. Cir. 2021).

      The existence of a takings claim may be particularly difficult to ascertain when the government's actions exacerbate natural processes to which a property is already subject.  The

plaintiffs in *Banks v. United States*, for example, alleged that Corps-built jetties in Lake Michigan effected a taking of their shoreline properties by exacerbating existing erosion conditions. 741 F.3d 1268 (Fed. Cir. 2014). The Federal Circuit explained that the difficulty of parsing the Corps-caused erosion from erosion that would have naturally occurred "complicate[d] determining when [a]ppellants knew or should have known of their alleged takings claims." *Id.* at 1281.

Under the governing precedents, determining when the plaintiffs' claims accrued requires deciding when the actions fixing the government's liability occurred and whether the stabilization doctrine applies.

### B.      Accrual of the Plaintiffs' Claims

The challenge the plaintiffs face in their second amended complaint is the same one addressed in *Riverview Farms I*: the complaint's allegations of "atypical flooding" are too general to allege that the plaintiffs' properties have experienced an increase in flooding that can be traced to river-training structures. Like the first amended complaint, the second amended complaint presents a theory of how a plaintiff *could* experience a taking caused by river-training structures. Across nearly 50 pages, the complaint explains in detail the history of river-training structures on the Mississippi and Ohio rivers and the flooding that the plaintiffs have experienced. Despite its length and detail, however, the complaint fails to allege the crucial facts on which the plaintiffs' entitlement to compensation turns—that since the limitations period began in July 2012, the plaintiffs' properties have experienced a material increase in atypical flooding *because of* the Corps' installation of river-training structures. Instead, the complaint follows a strategy familiar to anyone who has taken an exam: when you do not know the answer to a question, attempt to find one by writing down every piece of information that you can think of about the topic and hope something sticks. The result of that strategy in this case is that the plaintiffs, having conducted discovery, now present facts and raise arguments in their briefs that are absent from the second amended complaint.

The operative complaint alleges that the plaintiffs have suffered a recent increase in atypical flooding attributable to river-training structures. The plaintiffs do not, however, define when that atypical flooding occurs. Only in opposition to the defendant's motion to dismiss have the plaintiffs finally proffered facts regarding the timing of the atypical flooding they allege has started to occur. Similarly, the connection between the existence of river-training structures and any specific plaintiff is not alleged. The facts the plaintiffs finally adduced in opposition to the motion are not adequately alleged in the complaint.

### 1.      Government Action

The first step in analyzing when the plaintiffs' claims accrued is determining the government action that caused the alleged taking. Flooding can occur for any number of reasons. The most common, perhaps, is too much rain in too short a time for the rain to be absorbed. The plaintiffs are not seeking damages for flooding; instead, they are seeking damages for flooding *caused by* the defendant. The plaintiffs need not prove their claims but must, at this stage of the case, show by preponderant evidence that the atypical flooding of which they

complain can plausibly be tied to the action of the Corps and commenced or became knowable within the limitations period.

The statute of limitations is not triggered when the plaintiffs knew or should have known that the taking had turned into an unbearable intrusion onto their land.  Instead, the statute of limitations is triggered when the plaintiffs knew or should have known about the defendant's action or series of actions that caused the taking.  As the Federal Circuit has explained, the "proper focus . . . 'is upon the time of the [defendant's] *acts*, not upon the time at which the *consequences* of the acts became most painful.'"  *Fallini*, 56 F.3d at 1383 (emphasis in original) (quoting *Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980)).

Here, the defendant's acts challenged by the plaintiffs are the Corps' installation of river-training structures in the Mississippi and Ohio rivers.  The installation of river-training structures is the only action the complaint alleges the defendant has performed to cause the flooding.  The Corps has been installing such structures since Congress first authorized them in 1910.  As was noted in *Riverview Farms I*, 91 percent of these structures in the Middle Mississippi River and 96 percent of those in the Lower Mississippi River have been in place since the year 2000.  2019 WL 6211224, at *4.

Instead of connecting the alleged taking to the Corps' installation of river-training structures that had largely been in place for 18 years at the time of the plaintiffs' first complaint, the plaintiffs connect the accrual of their claim to the rising water levels they allege the river-training structures have caused.  The difference is subtle, but crucial.  In *Fallini*, the Federal Circuit distinguished between the two types of conduct.  The plaintiffs in that case alleged in 1992 that the government had taken their property—private water sources for grazing cattle on public property—when Congress enacted the Wild Free-Roaming Horses and Burros Act in 1971.  That law prohibited the plaintiffs from chasing away or otherwise preventing wild horses on public lands from consuming water from the plaintiffs' water sources installed for their cattle.  56 F.3d at 1379-1380.  Even though the plaintiffs had known about the law since its enactment, they argued that the law's consequences had only stabilized within the statute-of-limitations period.  *Id.* at 1381.

Vacating summary judgment for the government and instead dismissing the complaint, the Federal Circuit held that the plaintiffs' claim was untimely.  Writing for the panel, Judge Bryson explained that the stabilization doctrine does not allow a plaintiff to hold off on suing until the damage stops increasing over time.  To allow that, the Federal Circuit noted, would produce a result in which a continually compounding claim like the one alleged by the plaintiffs in *Fallini* and alleged here by the plaintiffs would never accrue.  *Id.*  The holding of *Fallini* followed on the decision of the Court of Claims *Gustine Land & Cattle Co. v. United States*, in which the court held that a broad interpretation of the stabilization doctrine "would put the *Dickinson* doctrine in unending conflict with the statute of limitations."  174 Ct. Cl. 556, 656 (1966).

In *Fallini*, the Federal Circuit explained that it was the government's enactment of the statute, not the individual intrusions of horses, that constituted the government action about which the plaintiffs knew or should have known for claim accrual purposes.  56 F.3d at 1383.

20

The plaintiffs therefore could not wait until the horses had consumed what the plaintiffs thought to be an unacceptable amount of water; they had to sue once they knew, through the passage of the 1971 Act, that the horses would permanently be drinking the plaintiffs' water.  In short, the court held, "because the [plaintiffs] identif[ied] the enactment of the [Act] as the governmental action that" caused their taking, and "because they admit that they suffered injury from the date of the enactment, their claim must be regarded as accruing long before they filed the present suit."  *Id.*  It was the enactment of the 1971 Act, not the horses' water consumption, that constituted the government action.

The plaintiffs here present a more typical stabilization claim in that it concerns flooding.  The Federal Circuit's analysis in *Fallini* of the timeliness issue is nonetheless instructive.  The Corps' installation of river-training structures is the government action that allegedly caused harm to the plaintiffs.  Those static structures were installed in full public view, and they sit openly and conspicuously in the rivers.  These structures affect water flow from the moment of their installation.  While the plaintiffs do not contest that they knew about the structures at the time of their installation, they allege that "each successive construction on the [r]ivers adds to and exacerbates the magnitude of flooding."  (ECF 56 at ¶ 257.)  The plaintiffs allege that because of the incremental nature of the impact resulting in their injuries, the stabilization doctrine applies because no taking was apparent when the Corps initially installed the structures.

Given the structures' alleged cumulative effects, the stabilization doctrine applies to the plaintiffs' claims.  The factual record, however, does not support the claim that the temporally generic atypical takings alleged in the second amended complaint did not stabilize until sometime within the statute of limitations period.  Because the plaintiffs never seek to define when the atypical flooding they attribute to the river-training structures occurs, the analysis of the evidence must itself be equally generic.  There is no apparent increase in atypical flooding across the year since July 2012, or indeed prior to that date, at least since the 1980s.  Instead, flooding occurs at different times and in different years, outside of the admittedly regular flooding that occurs from January through April.

To the extent the evidence reflects any increase in flooding after installation of the river-training structures, it happened years before 2012.  The table below charts the number of years within each six-year span leading to the statute of limitations period that each bellwether plaintiff experienced flooding for an above-average number of days. The analysis begins in 1976 to end with a final span of years that covers the statutory period exclusively.  The chart is not specific to July flooding because the operative complaint does not limit the claims of atypical flooding to that month.

|  | 1976-1981 | 1982-1987 | 1988-1993 | 1994-1999 | 2000-2005 | 2006-2011 | 2012-2018 |
|---|---|---|---|---|---|---|---|
| **Buchanan** | 1 year | 4 years | 3 years | 3 years | 2 years | 4 years | 4 years |
| **LaFont** | 1 years | 4 years | 4 years | 4 years | 2 years | 3 years | 3 years |
| **Boatwright** | 2 years | 4 years | 4 years | 4 years | 1 year | 3 years | 4 years |
| **Morrow** | 1 year | 4 years | 3 years | 3 years | 2 years | 4 years | 4 years |
| **Island Farms** | 2 years | 4 years | 3 years | 3 years | 1 year | 4 years | 3 years |
| **Riverview Farms** | (Average data not available) | | | | | | |

These data reflect that the heaviest flood levels at an annual level increased between 1982 and 1987.  While four years of atypical flooding also occurred during the statute of limitations period for some bellwethers, that extent of flooding does not reflect a material change in atypical flooding.  It was, rather, a repetition of previous recent periods of flooding.  These data do not rely on the plaintiffs' current scenario of atypical July flooding, because that scenario has not been alleged in the second amended complaint.

Not only do the data reflect that any increase in flooding occurred prior to the limitations period, but the plaintiffs have failed to allege that specific river-training structures installed in either river since 2012 have had any effect on the atypical flooding.  The plaintiffs seek to blame the atypical flooding on the cumulative effect of the river-training structures.  They may do so under the stabilization doctrine, but when more than 90 percent of those structures have been in place since before 2000, their allegation becomes untenable.  They could have sought to identify the location and timing of the installation of river-training structures since 2012, or even plausibly alleged that such structures installed perhaps as early as 2008 might have led to atypical flooding.  Instead, they make no allegations specific to the installation of river-training structures since 2000, leaving a 12-year gulf between the second amended complaint's last reference to the installation of structures and the allegations of when the atypical flooding first occurred.  This discrepancy is particularly striking, given that the plaintiffs' theory of the cumulative effect of additional river-training structures necessarily implies that at some point every added structure should have caused or exacerbated the atypical flooding.

As the *Fallini* court explained, a plaintiff cannot wait until the damages have stopped increasing to bring its claim.  *Fallini*, 56 F.3d at 1383; *see also Boling*, 220 F.3d at 1371 (explaining that it is the uncertainty as to whether a taking occurred at all, not the uncertainty surrounding the ultimate damage wrought by the taking, that must stabilize before the plaintiffs' claim accrues).  While the plaintiffs argue that the effects of the structures are cumulative because the Corps continues to install structures and effect the taking, they have not in their

current complaint met their burden to show that a permanent taking tied to a government action had only first become apparent during the statute of limitations period.  In short, even if some cumulative number of structures effected a taking here, the plaintiffs do not identify what government action was the proverbial straw that broke the camel's back which caused their claims to first accrue and against which the stabilization doctrine could be measured.

### 2.    When the Plaintiffs Knew or Should Have Known

Having established that the government action in the alleged taking is the Corps' installation of river-training structures, the question of whether the plaintiffs knew or should have known is straightforward.  The opinions in *Jackson-Greely Farm v. United States*, a case with factual similarities, are instructive.

The 62 plaintiffs in *Jackson-Greely* owned land near the Mississippi and Ohio rivers in Alexander County, Illinois.  *Jackson-Greely*, 144 Fed. Cl. at 612.  Like the plaintiffs here, the *Jackson-Greely* plaintiffs alleged that river-training structures in the Mississippi River had a cumulative effect on water levels, and that the "mean local stage of the river [had] been progressively increasing as a result of the Corps' addition of new structures over time." *Id.* at 618.  In support of their allegations, the plaintiffs relied on Dr. Pinter's theory that river-training structures cause increased flooding.  *Id.* at 619.  While the *Jackson-Greely* plaintiffs had, like the plaintiffs here, experienced seasonal and anomalous flooding on their properties for years, they brought their case in 2018 after a 2016 levee break, for which the Federal Emergency Management Agency ("FEMA") refused to provide the repair funds that it had provided when the same levee had previously broken.  *Id.* at 617-18.  Although the plaintiffs had been aware of the river-training structures, including the levee, the seasonal flooding on their properties, and the flood-causing damage to the levee that had occurred nearly 20 times since the 1920s, they alleged their claim was timely because the flooding had only "stabilized" after the 2016 levee break that had gone unrepaired.  *Id.* at 616-18, 624.

In granting the defendant's motion to dismiss, now-Chief Judge Kaplan held that the plaintiffs' claims were time-barred because they "knew or should have known" before the statute of limitations expired in August 2012 that "their property was subject to inevitably recurrent flooding." *Id.* at 626.  She found that several facts indicated their claims were untimely.  First, it was "undisputed" that the area in which the plaintiffs' properties were located "ha[d] been subject to frequent flooding since the nineteenth century." *Id.* at 622.  Even focusing only on the levee whose breach led to the suit, there had been "severe flooding more recently in 1973, 1993, 1994, 2008, and 2011." *Id.*  Second, the plaintiffs had not produced any evidence to show that the late-20[th]-century floods were *not* caused by the river-training structures they now alleged caused the 2016 flooding about which they complained. *Id.* at 623.  Third, the theory that river-training structures could cause water levels to increase had been "the subject of academic discussion since the mid-1970s." *Id.* at 623.  Dr. Pinter himself had been writing and speaking in public fora on the theory since 2008. *Id.* at 619.

Finally, Judge Kaplan held that the stabilization doctrine could not save the plaintiffs' claims because "their claims for a permanent taking clearly stabilized before August 3. 2012," the outer limit of the statute-of-limitations period. *Id.*  This was true, she explained, notwithstanding

the fact that FEMA's refusal to provide relief after the 2016 levee break left the plaintiffs susceptible to even more frequent flooding.  Instead, she held that the plaintiffs' claims had accrued at the time they knew or should have known the Corps' acts constituted a permanent taking, "'not upon the time at which the consequences of the acts became most painful.'"  *Id.* at 624 (quoting *Boling*, 220 F. 3d at 1371).

On appeal, the Federal Circuit affirmed.  *Jackson-Greely*, 857 Fed. App'x. 1021.  Based on the record, it held, the evidence did "not demonstrate that there was a recent increase in the construction of river training structures that would justify claim accrual" within the statute-of-limitations period.  *Id.* at 1026.  The Federal Circuit agreed that, although the Corps continued to build river-training structures, the plaintiffs did not seem to be "arguing that it was only after 2016 that the number and variety of river training structures in the Middle Mississippi River reached sufficient critical mass to cause atypical flooding" of the plaintiffs' properties.  *Id.* at 1025 (cleaned up).

As to whether the stabilization doctrine could render the plaintiffs' claim timely, the Federal Circuit affirmed the holding, explaining that "the stabilization doctrine does not require that the process has ceased or that the entire extent of the damage is determined."  *Id.* at 1027.  Instead, plaintiffs attempting to assert that a takings claim has recently stabilized must "show that there was a material change *in the effect* of river training structures during the statutory time period that would justify finding that their claims stabilized after" the statutory period had commenced.  *Id.* (emphasis added).  The plaintiffs had failed to do so.

The plaintiffs here allege essentially the same facts as those alleged by the *Jackson-Greely* plaintiffs.[6]  They acknowledge that the Corps has been installing river-training structures in the Mississippi River since the beginning of the 20th century, and they base their claim that the structures cause increased flooding on the academic theory from the 1970s that Dr. Pinter popularized in the early 2000s.

As to the stabilization doctrine, the plaintiffs' argument that their takings claim did not stabilize until the emergence of July flooding argued in their brief but not alleged in their second amended complaint resembles the *Jackson-Greely* plaintiffs' stabilization claim.  Exchange "the 2016 levee break is the first time the damage has gone unmitigated" from *Jackson-Greely* with the argument here that "anomalous July flooding is the first time [that] flooding has caused major crop damage," and the *Boling* rule again applies to bar the claim.  Thus, the plaintiffs here could not wait to sue until the damage caused by the alleged taking had become most painful.

_____

[6] In *Riverview Farms I*, the Court distinguished *Jackson-Greely* as being much narrower than the plaintiffs' claims.  2019 WL 6211224, at *10.  While *Jackson-Greely* centered on the Corps' decision not to rebuild a single failed levee rather than the taking alleged here, the facts developed by the parties show that the plaintiffs' allegations in both cases are similar and suffer from the same fundamental defect.

Further, the plaintiffs have failed to allege any material change in the number or effect of river-training structures during the limitations period that would support finding that their claims had only stabilized after the statutory period had commenced.  Had the plaintiffs alleged the number or location of additional river-training structures installed in either river since 2012 had the cumulative effect on atypical flooding for which they are seeking compensation, the claims here could be distinguished from those rejected in *Jackson-Greely*.  The plaintiffs have not done so.

Additionally, the evidence presented here suggests that all the bellwether plaintiffs or their predecessors in interest either knew or should have known about their claims before July 2012.  Gage data at both the Paducah and Cairo gages reveal that above-average flooding has occurred with regularity over the past several decades.  All the bellwether plaintiffs testified in their depositions that they closely monitor flood conditions as part of their farm work, so they should have been aware of departures from typical flood conditions.  Each bellwether plaintiff testified to having to modify planting practices in years outside the statute of limitations period to accommodate flood patterns.  For example, Mr. Davis testified that Riverview Farms has shifted its soybean planting practices to early April when the season previously lasted until mid-May.  (ECF 135-3 at 109.)  Mr. Morrow testified that flooding forced him to stop growing wheat on his properties around 2010.  (*Id.* at 66.)  Even when these shifts in planting did not ultimately prevent them from growing and harvesting a crop, the need to alter planting schedules due to unusual flooding should have put the plaintiffs on notice of a claim related to changing flood patterns; even the stabilization doctrine does not permit the plaintiffs to delay suit until the flooding that prompted changes in planting practices had its greatest impact on their bottom lines.

## V.     CONCLUSION

At both a general and bellwether-specific level, the plaintiffs have not shown by a preponderance of the evidence that the claims for the takings they allege in their second amended complaint are timely.  No evidence produced has shown that the plaintiffs suffered an increase in flooding caused by the Corps' river-training structures during the statutory period or that the claims stabilized within the statutory period.  The defendant's motion to dismiss the second amended complaint, therefore, will be granted, but the final resolution and order will be deferred pending a motion for leave to amend the complaint.

Because the plaintiffs' failure to prove their complaint is timely is due in part to the misalignment between the facts alleged in the complaint and the evidence the plaintiffs are now offering about July-specific flooding, they will have one final opportunity to seek leave to amend their complaint, with some caveats.  First, the motion must include a draft of the proposed complaint.  Second, the plaintiffs must explain in the motion how their allegations of a July-only increase in flooding can amount to a taking on the merits sufficient to state a claim for a taking.  Third, the plaintiffs must explain at a bellwether-specific level how particular river-training structures have caused flooding on their properties.  The plaintiffs cannot allege a general theory that river-training structures raise surface elevation levels and that such structures have a specific effect on parcels located near them, unless they can explain how specific river-training structures

cause specific effects on specific properties.  They failed to do so in the second amended complaint.

The plaintiffs have also failed to tailor their current theory to the facts that have been developed.  For example, the second amended complaint alleges that upstream and instream structures affect flooding on a particular property, but the nearest upstream river-training structure to Mr. Boatwright's upstream parcel appears to be 14 miles away (*see* ECF 135-22 at 2), and the nearest upstream structure to Riverview Farms is at least 8 miles away (*see id.* at 4).  The plaintiffs must conform the theory underlying their claims to the facts that have been developed, and they must do so not only for the bellwether plaintiffs, but for all the plaintiffs.  This conformity should have been done before any complaint was filed, *see* RCFC 11(b), but at least must be done in conjunction with any proposed third amended complaint.

Fourth, if the plaintiffs continue to assert claims for plaintiffs on the Ohio River, they must present a distinct theory regarding the impact of the Olmsted Dam on atypical flooding in July and why that impact is the same as the impact from the other river-training structures that allegedly cause atypical July flooding.

The plaintiffs shall move for leave to file a third amended complaint no later than **September 30, 2024**.  If the plaintiffs file a motion for leave to file a third amended complaint, the defendant shall file its response by **October 28, 2024**, and the plaintiffs shall file any reply by **November 12, 2024**.  If the plaintiffs opt not to seek leave to amend their complaint by September 30, the Court will schedule a status conference.  Alternatively, if the plaintiffs prefer, they may move at any time prior to September 30, 2024, to have the Court enter judgment, based on this decision, dismissing the second amended complaint so that they may appeal without further delay.

The grant of the defendant's motion to dismiss the second amended complaint (ECF 135) is **DEFERRED** pending the filing and resolution of any timely motion the plaintiffs file for leave to amend the complaint.  The plaintiffs' motion for leave to amend the second amended complaint (ECF 136) is **DENIED as moot**, but the plaintiffs may include the additional allegations they sought to add to the second amended complaint in any third amended complaint they propose to file.

It is so **ORDERED**.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**